1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3  DARIUSZ JAWORSKI, BOGUSLAW      )
    MOSKAL and RYSZARD BESTER,      )
 4                                  )
                    Plaintiffs,     )
 5                                  )
    -vs-                            )  Case No. 09 C 7255
 6                                  )
    MASTER HAND CONTRACTORS, INC.,  )  Chicago, Illinois
 7  MASTERHAUS BUILDERS, INC.,      )  March 7, 2016
    PURCON, LTD., and WALTER F.     )  9:38 a.m.
 8  BOCHENEK, individually,         )
                                    )
 9                    Defendants.   )

10

                TRANSCRIPT OF PROCEEDINGS - TRIAL
11                         VOLUME 1
            BEFORE THE HONORABLE JOHN J. THARP, JR.
12
    APPEARANCES:
13
    For the Plaintiff:     MR. CHRISTOPHER J. WILLIAMS
14                         WORKERS' LAW OFFICE, P.C.
                           53 West Jackson Street, Suite 701
15                         Chicago, Illinois  60604

16                         MS. LYDIA COLUNGA-MERCHANT
                           RAISE THE FLOOR ALLIANCE - LEGAL DEPT.
17                         1 North LaSalle Street, Suite 1275
                           Chicago,  Illinois  60602
18
    For the Defendant:     MR. DONALD J. McNEIL
19                         THE LAW OFFICE OF DONALD J. McNEIL
                           617 West Fulton Street
20                         Chicago, Illinois  60661

21  Also Present:          MS. URSULA TRIPP, Interpreter
                           MS. MALGORZATA KUZNIAR, Interpreter
22  Court Reporter:
                        KELLY M. FITZGERALD, CSR, RMR, CRR
23                         Official Court Reporter
                        United States District Court
24              219 South Dearborn Street, Room 1420
                        Chicago, Illinois  60604
25                 Telephone:  (312) 818-6626
                    kelly_fitzgerald@ilnd.uscourts.gov
```

I  N  D  E  X

WITNESS:                                           PAGE

BOGUSLAW MOSKAL

Direct Exam by Ms. Colunga-Merchant          5
Cross Exam by Mr. McNeil                      32

DARIUS JAWORSKI

Direct Exam by Ms. Colunga-Merchant          53
Cross Exam by Mr. McNeil                      86

RYSZARD BESTER

Direct Exam by Ms. Colunga-Merchant          91
Cross Exam by Mr. McNeil                      110

AGNES KEDZIERSKI

Direct Exam by Mr. Williams                   118

WALTER F. BOCHENEK

Direct Exam by Mr. McNeil                     125
Cross Exam by Mr. Williams                    148


INDEX TO EXHIBITS

PLAINTIFF'S EXHIBIT                           RECEIVED

No. 1                                         28
No. 2                                         31
No. 3                                         61
No. 4                                         74
No. 5                                         79
No. 6                                         82
No. 7                                         106
No. 8                                         110
Nos. 9 & 10                                   161

1          (Proceedings heard in open court:)

2          THE CLERK:  09 CV 07255, Jaworski v. Master Hand.

3          MR. WILLIAMS:  Good morning, Your Honor.  Chris

4     Williams here on behalf of the plaintiffs.

5          MS. COLUNGA-MERCHANT:  Good morning, Your Honor.

6     Lydia Colunga-Merchant on behalf of the plaintiffs.

7          MR. McNEIL:  And Don McNeil on behalf of defendants.

8          THE COURT:  Good morning.

9          MR. McNEIL:  Good morning.

10         THE COURT:  All right.  Are we ready to --

11         MR. WILLIAMS:  We are ready to go, Your Honor.  We

12    had provided a binder with the trial documents in it, and I

13    think the clerk just handed you the -- your courtroom deputy

14    just handed you a table of contents essentially to what those

15    documents are.

16         THE COURT:  All right.

17         MR. McNEIL:  We haven't seen them in this form at

18    least.  I hope you'll excuse me if I'm flipping pages

19    occasionally.

20         MR. WILLIAMS:  You can have this.

21         MR. McNEIL:  Thank you.

22         THE COURT:  Okay.

23         MR. WILLIAMS:  And, Judge, we have two witnesses that

24    we're going to call here first.

25         THE COURT:  All right.

1          MR. WILLIAMS:  The witnesses in Poland, unfortunately
2    we couldn't start until 11:00.
3          THE COURT:  All right.
4          MR. WILLIAMS:  We'll do another witness here before
5    we do the Poland witnesses.
6          THE COURT:  Okay.  That's fine.
7          MR. McNEIL:  An eight-hour difference?
8          MS. COLUNGA-MERCHANT:  Seven.
9          MR. McNEIL:  Seven.
10          MR. WILLIAMS:  So they're there in the evening now.
11          THE COURT:  Okay.  All right.
12          MR. WILLIAMS:  We're ready to go.
13          THE COURT:  That's perfectly fine.  Let's get started
14    then.
15          MR. McNEIL:  Thank you.
16          MR. WILLIAMS:  Okay.
17          MS. COLUNGA-MERCHANT:  Your Honor, we would like to
18    get our case started by calling Mr. Boguslaw Moskal to the
19    stand.
20          THE COURT:  All right.  Good morning.
21          Alberta, do we need the --
22          THE CLERK:  No, I'm going to turn it off.
23      (Witness sworn.)
24          THE DEFENDANT:  I swear, I do.  Yes, I do swear.
25          THE COURT:  Please be seated.

1          MR. McNEIL:  Your Honor, can we identify the

2    translator for the record?

3          THE COURT:  Yes, actually.  Thank you.

4          Ma'am, could you put your name on the record?

5          INTERPRETER TRIPP:  Ursula Tripp, U-r-s-u-l-a, Tripp,

6    T-r-i-p-p.

7          THE COURT:  And you are a court-certified

8    interpreter?

9          INTERPRETER TRIPP:  I am district court.

10          THE COURT:  Polish?

11          INTERPRETER TRIPP:  Yes.

12          THE COURT:  Okay.  Thank you.

13       BOGUSLAW MOSKAL, PLAINTIFF'S WITNESS, DULY SWORN,

14                     DIRECT EXAMINATION

15    BY MS. COLUNGA-MERCHANT:

16    Q.  Can you please state your name for the record.

17    A.  Boguslaw Moskal.

18    Q.  And do you know a person named Walter Bochenek?

19    A.  Yes, I do.

20    Q.  Did you work for Mr. Bochenek from approximately 1998 to

21    February 2009?

22    A.  Yes.

23    Q.  And do you remember who hired you?

24    A.  Walter Bochenek.

25    Q.  And were you hired as an individual or as a business?

Moskal - direct

6

1   A.  As an individual.  I arrived from Poland, and I got hired.

2   Q.  And did you understand that Mr. Bochenek was the owner of

3   Master Hand Contractors, Inc., Masterhaus Builders, Inc. and

4   Purcon Ltd.?

5           MR. McNEIL:  Objection.  Foundation.

6           THE COURT:  Hold on.  Hold on.  There's an objection

7   pending.

8           I'll overrule the objection.  You can follow up with

9   a foundation, if he has such an understanding.

10          MS. COLUNGA-MERCHANT:  Okay.

11  BY THE WITNESS:

12  A.  I don't know if he was, but I was hired by Master Hands.

13  I don't know about other companies.

14  BY MS. COLUNGA-MERCHANT:

15  Q.  Okay.

16  A.  But I was receiving checks from three companies.

17  Q.  From the three companies, okay.  And for the period of

18  1998 to February 2009, did you sign a contract with Master

19  Hand?

20  A.  I am sorry.  When I was -- at the time I was hired I

21  signed some kind of papers, but later on I did not have to

22  sign any.

23          MS. COLUNGA-MERCHANT:  Okay.  But at the time of

24  hire, did he sign a contract with Master Hand?

25

1   BY THE WITNESS:

2   A.  No, I did not.

3           MS. COLUNGA-MERCHANT:  Okay.  For the period of 1998

4   to February 2009, did he sign a contract with Masterhaus?

5   BY THE WITNESS:

6   A.  One -- no, no.  I did not sign any of this.  I was hired

7   under certain conditions that were set at the beginning and

8   then nothing could change after that.

9           MS. COLUNGA-MERCHANT:  Okay.  But just to be clear

10  for the record, during 19 -- for the period of 1998 to

11  February 2009, he did -- did he sign a contract with

12  Masterhaus?

13  BY THE WITNESS:

14  A.  I did not sign anything.

15          MS. COLUNGA-MERCHANT:  Okay.  And also pretty much

16  the same question for the period of 1998 to February 2009, did

17  he sign a contract with Purcon?

18  BY THE WITNESS:

19  A.  No, I did not.

20          MS. COLUNGA-MERCHANT:  Okay.  And throughout his time

21  working for Mr. Bochenek, did he have to sign a contract for

22  each job he worked on for any of the three companies?

23          MR. McNEIL:  Objection.  Foundation.

24          THE COURT:  Overruled.

25

Moskal - direct

8

1  BY THE WITNESS:

2  A.  I don't understand this question.

3  BY MS. COLUNGA-MERCHANT:

4  Q.  Okay.

5  A.  What do you mean?

6         MS. COLUNGA-MERCHANT:  Sure.  So every time he

7  received a job assignment during the period of 1998 to

8  February 2009, did he have to sign a contract with either

9  Master Hand, Masterhaus or Purcon?

10 BY THE WITNESS:

11 A.  No.

12 BY MS. COLUNGA-MERCHANT:

13 Q.  Okay.  And for the period of 1998 to February 2009, did

14 you receive payment for your work in checks issued from Master

15 Hand?

16 A.  No.  I was receiving checks, but I got checks from

17 Masterhaus, Purcon, and Master Hand.

18        MS. COLUNGA-MERCHANT:  Okay.  So then he -- during

19 this period of -- from 1998 to February 2009, he did receive

20 payment from -- payment for his work in checks from Master

21 Hand?

22 BY THE WITNESS:

23 A.  Well, I don't remember right now.  I was receiving checks

24 from three sources:  Purcon, Master Hand and Masterhaus.  So I

25 don't remember.

1    MS. COLUNGA-MERCHANT:  Okay.  So was there a

2  difference in the work that he was performing for these

3  companies that required payment from the different companies?

4  BY THE WITNESS:

5  A.  No.

6  BY MS. COLUNGA-MERCHANT:

7  Q.  Okay.  Going forward, I'm going to refer to Master Hand,

8  Masterhaus and Purcon as Master Hand; okay?

9  A.  Okay.

10  Q.  Okay.  Do you remember when you stopped working for Master

11  Hand?

12  A.  I worked all this time for Master Hand.  I was hired by

13  Master Hand.  But checks were coming from Purcon, Masterhaus.

14  I don't know.

15    MS. COLUNGA-MERCHANT:  Right.  So just to repeat the

16  question, does he remember when he stopped working for Master

17  Hand?

18  BY THE WITNESS:

19  A.  Altogether or what do you mean?

20    MS. COLUNGA-MERCHANT:  Right.  Altogether when did he

21  stop?  When was the last date of employment?

22  BY THE WITNESS:

23  A.  2009.

24    MS. COLUNGA-MERCHANT:  Okay.  Okay.  And so did he --

25

1   BY MS. COLUNGA-MERCHANT:

2   Q.  Did you work continuously for Mr. Bochenek and Master Hand

3   from approximately 1998 through approximately February 2009?

4   A.  What do you mean?  Are you asking me if I worked for him?

5          MS. COLUNGA-MERCHANT:  Right.  Throughout the whole

6   entire period, did he work for...

7   BY THE WITNESS:

8   A.  I have no clue what you mean.  What do you mean?  If I

9   stopped working for them so how could I continue working for

10  them?

11  BY MS. COLUNGA-MERCHANT:

12  Q.  No, no, no.  So during the time period from 1998 through

13  February 2009.

14  A.  Yes.

15         MS. COLUNGA-MERCHANT:  Did he work for Master Hand

16  throughout that entire period of time?

17  BY THE WITNESS:

18  A.  Yes.  Okay.  Okay.

19  BY MS. COLUNGA-MERCHANT:

20  Q.  Okay.

21  A.  Yeah, I didn't understand your question.

22  Q.  Okay.  Did you work for any other companies while you

23  worked for Master Hand?

24  A.  No.

25  Q.  Okay.  And while you worked for Master Hand, could you

 1  have worked for other companies without the authorization of

 2  Mr. Bochenek?

 3  A.  No.

 4  Q.  While you were employed by Mr. Bochenek and Master Hand,

 5  were you aware of any other people who worked for

 6  Mr. Bochenek?

 7  A.  Yes.

 8  Q.  Can you tell me the names of some of the people who worked

 9  for Mr. Bochenek?

10  A.  Wolan, Robert; Kosich, Stkojiac; Kieslawicz, Bogdan.

11          MS. COLUNGA-MERCHANT:  Okay.  Does he remember any

12  others?

13  BY THE WITNESS:

14  A.  Well, there were more, like a brother of Wolan, Robert and

15  then -- and then it was brother-in-law of Stkojiac Kosich.

16  There were many people.

17          MS. COLUNGA-MERCHANT:  Sure.  Does he recall if

18  Dariusz Jaworski worked with -- worked for Mr. Bochenek?

19  BY THE WITNESS:

20  A.  Yes.

21          MS. COLUNGA-MERCHANT:  Does he recall -- was he aware

22  of Ryszard Bester who also worked for Mr. Bochenek during this

23  time, or Richard Bester?

24  BY THE WITNESS:

25  A.  Yes.

1          MS. COLUNGA-MERCHANT:  Okay.  And does he recall

2    someone by the name of Agnes Kedzierski working for

3    Mr. Bochenek?

4    BY THE WITNESS:

5    A.  Yeah, she was the secretary.

6          MS. COLUNGA-MERCHANT:  Okay.  And does he recall a

7    Mr. Bogdan Kulikowski who worked for Mr. Bochenek?

8    BY THE WITNESS:

9    A.  Yes, he was a manager at school.

10   BY MS. COLUNGA-MERCHANT:

11   Q.  Okay.  And what was your job title when you worked for

12   Mr. Bochenek and Master Hand?

13   A.  Most of the time I worked as specialist of demolitions,

14   and I had to drive truck very often.

15         MS. COLUNGA-MERCHANT:  Okay.  So as a person

16   specializing in demolitions, what were the typical job

17   assignments that he performed?

18   BY THE WITNESS:

19   A.  Any -- any finishing -- in construction?

20   BY MS. COLUNGA-MERCHANT:

21   Q.  Yes.

22   A.  Like building walls, finishing jobs.  Everything as it's

23   being done in construction.

24   Q.  Okay.  And who gave you your job assignments?

25   A.  Bochenek Walter.  He was the boss.

1    Q.  Okay.  And when would Mr. Bochenek give you these job

2    assignments?

3    A.  Okay.  Every morning upon arrival to work, he would decide

4    you go here, you go there, you go somewhere else.  And if the

5    construction was in progress, it was big construction, then

6    every morning he would tell us that you would be doing this,

7    you would be doing that.  Some of us would be doing something

8    else.

9              THE COURT:  Counsel, let me just interrupt you for a

10   minute.  I just want to be sure both counsel understand that

11   witnesses should be excluded from the courtroom if there are

12   any witnesses present that either side intends to call.  I

13   neglected to make sure of that fact.

14             MR. WILLIAMS:  Agnes can step out.

15             Are you calling Mr. Bochenek?

16             MR. McNEIL:  Yes.

17             THE COURT:  All right.  Well, anyone who continues to

18   be present during the testimony will not be called.

19             MR. McNEIL:  Nonparty?

20             THE COURT:  Nonparties.

21             MS. COLUNGA-MERCHANT:  Okay.

22             THE COURT:  Okay.  Go ahead, Counsel.  I'm sorry.

23             MS. COLUNGA-MERCHANT:  No, that's okay, Your Honor.

24   BY MS. COLUNGA-MERCHANT:

25   Q.  Did someone supervise your work at Master Hand?  Did

Moskal - direct

14

1  someone supervise your work at Master Hand?

2  A.  Yes, just Bochenek.

3  Q.  Okay.  And did you receive instructions or direction on

4  how to complete your job assignments?

5  A.  Yes.  Yes.

6  Q.  Okay.  And --

7  A.  I was -- I couldn't make a decision independently.

8         MS. COLUNGA-MERCHANT:  Okay.  So who would he -- from

9  whom did he receive the instructions or directions to complete

10  the job assignment?

11  BY THE WITNESS:

12  A.  Bochenek Walter, my boss.

13  BY MS. COLUNGA-MERCHANT:

14  Q.  Okay.  And how would he -- how would he direct your work?

15  A.  Well, he did direct.  Like, he would come to the meeting

16  place or depot place.  He would tell us every morning, like,

17  you go here, you go there, you do this, you do that.

18  Q.  Okay.  And did you get to decide which materials would be

19  used to complete your job assignments?

20  A.  No, I did not.  I would call Bochenek, my boss, and I

21  would ask him -- I would ask him what materials he wants us to

22  use and what materials I should go and buy at Home Depot

23  because most of the time we were shopping at Home Depot.

24  Q.  Okay.  So just to be clear, it was Mr. Bochenek who

25  decided what materials would be used to complete the jobs?

1    A.  Yes, this is his company.

2    Q.  Okay.  Did Mr. Bochenek also decide which tools would be

3    used to complete job assignments?

4    A.  Yes.  Most of -- yeah, I would say because when we were

5    going to -- to the job sites, he would tell us, like, take

6    this tools, that tools or whatever else.  And all the tools

7    were owned by the company, so we would go as part of the

8    directions to the warehouse and go get the proper tools.

9    Q.  Okay.  Did you provide materials to complete your job

10   assignments?

11   A.  Yeah.  I would call and ask first what they want me to

12   buy.  They would give me a check for that, and I would go to

13   Home Depot and purchase it.  And then they would write down on

14   a check the number of the check and then for what kind of job

15   or assignment it was.

16        MS. COLUNGA-MERCHANT:  Okay.  And just to clarify,

17   who does he mean by "they"?

18   BY THE WITNESS:

19   A.  What do you mean?  What do you mean, "they"?

20        MS. COLUNGA-MERCHANT:  Sure.  So he just stated, I

21   would call them, and they would tell me which materials to

22   buy.  Who does he mean by "they"?

23   BY THE WITNESS:

24   A.  It's Bochenek Walter.

25        MS. COLUNGA-MERCHANT:  Okay.  Thank you.

1      Okay.  And so without that prior approval from

2  Mr. Bochenek, could he decide --

3  BY MS. COLUNGA-MERCHANT:

4  Q.  Could you decide to purchase materials to perform your

5  task?

6  A.  No, never.

7  Q.  Okay.  And did you use your own tools at all to perform

8  your job duties?

9  A.  No.

10  Q.  Okay.  And did you have your own employees?

11  A.  Yes, I worked as a supervisor.  So if we were heading to

12  construction site, I would take one, two or three people with

13  me.

14  Q.  Was he -- were you responsible for hiring these workers?

15  A.  Absolutely.  Absolutely not.

16    (Short interruption.)

17    (Off the record.)

18      MS. COLUNGA-MERCHANT:  So just to repeat the

19  question, did he hire these employees that he's saying he

20  supervised?

21  BY THE WITNESS:

22  A.  Absolutely.  I was just supervising.  So Bochenek was the

23  one who would hire.

24      MS. COLUNGA-MERCHANT:  Okay.  So these workers that

25  he's saying he supervised --

1    THE COURT:  Hold on, Counsel.  You need to direct

2    your questions to the witness.  She will translate your

3    question, but when you start asking the translator the

4    question, the record is going to be very confused.

5    MS. COLUNGA-MERCHANT:  Okay.  Thank you, Your Honor.

6    BY MS. COLUNGA-MERCHANT:

7    Q.  So, Mr. Moskal, so the workers that you supervised were

8    Mr. Bochenek's workers?

9    A.  Yes.

10   Q.  Okay.  And so, Mr. Moskal, were you responsible for paying

11   these workers that you supervised?

12   A.  I was the same type of employee as the other were.  All I

13   did, I was taking these people to help me to do the job.

14   Q.  Okay.  So just to clarify then, Mr. Moskal, were these

15   workers your employees?

16   A.  No.

17   MS. COLUNGA-MERCHANT:  Okay.  And did he have --

18   BY MS. COLUNGA-MERCHANT:

19   Q.  Mr. Moskal, did you have the authority to hire your own

20   employees?

21   A.  But as I said, I did not employ anybody.

22   Q.  Okay.  Okay.  Did you have a set schedule while you worked

23   for Mr. Bochenek and Master Hand?

24   A.  Yes.  Yeah.  We worked from 7:00 to 5:00.

25   Q.  Is that 7:00 a.m. to 5:00 p.m.?

Moskal - direct

18

1    A.  Yeah, 5:00 p.m., but it did happen on and off that we

2    would be finishing work at 10:00 or 11:00 in the -- in the

3    evening.

4        MS. COLUNGA-MERCHANT:  Okay.  How many days during

5    the week did he work -- sorry.

6    BY MS. COLUNGA-MERCHANT:

7    Q.  Mr. Moskal, how many days during the week did you work

8    from 7:00 a.m. to 5:00 p.m.?

9    A.  Five days.  Saturdays we worked shorter hours, you know,

10   like two, three.

11   Q.  Okay.  So who set your work schedule?

12   A.  Bochenek Walter.

13   Q.  Okay.  And when were you given this schedule?

14   A.  Okay.  It all depends.  If the construction was ongoing,

15   it was ongoing construction, we would just show up at the

16   construction site at 7:00.  On other occasion he could do this

17   on a daily basis.

18       MS. COLUNGA-MERCHANT:  Okay.  When he was hired --

19   BY MS. COLUNGA-MERCHANT:

20   Q.  When you were hired, did Mr. Bochenek provide you with

21   this work schedule?

22   A.  Yes.  Yes, always.

23   Q.  Okay.  And would your schedule ever change?

24   A.  What do you mean?

25   Q.  Would your hours vary from 7:00 a.m. to 5:00 p.m. during

1  this time period?

2  A.  Yes, yes, yes.

3  Q.  Okay.  And who would inform you of any schedule changes?

4  A.  Everything was done by Bochenek Walter.

5  Q.  Okay.  And when would Mr. Bochenek inform you of the

6  change in your schedule?

7  A.  Okay.  So if it was ongoing construction site, we would

8  work, would show up at 7:00 and work till 5:00.  But if it was

9  another simultaneous job site going on, he could decide let's

10 say you can go -- you will go there, or you will stay here.

11 Q.  Okay.  Okay.  Could you decide to come into work later

12 than your scheduled start time?

13 A.  No.  Never.  I couldn't do this.  If I -- if I had a need

14 to leave work, like an hour or two hours before the end of the

15 workday, I had to get permission.

16        MS. COLUNGA-MERCHANT:  From whom did he have to --

17 BY MS. COLUNGA-MERCHANT:

18 Q.  From whom did you have to get that permission?

19 A.  Bochenek.

20 Q.  Okay.

21 A.  My boss.

22 Q.  Okay.  So would you have to obtain permission from

23 Mr. Bochenek to make any changes at all to that 7:00 a.m. to

24 5:00 p.m. work schedule?

25 A.  Yes.

Moskal - direct

20

1   Q.  Okay.  And to the best of your recollection, approximately

2   how many hours did you work in a work week?

3   A.  Over 50.  I would say 57, 58.  Sometimes it was 48.  It

4   depends.  I'm sure it's in the documents.

5           MS. COLUNGA-MERCHANT:  Okay.  So in a typical work

6   week, approximately how many hours would he have worked?

7   BY THE WITNESS:

8   A.  50.  55.  56.  57.  It depends.

9           MS. COLUNGA-MERCHANT:  Okay.  But typical -- okay.

10  But typically would he say how many hours, if he worked

11  from -- if he worked from 7:00 a.m. to 5:00 p.m. for five days

12  during the week, about how many hours would he say he

13  typically worked?

14  BY THE WITNESS:

15  A.  I had a half an hour for lunch, break for lunch.

16  BY MS. COLUNGA-MERCHANT:

17  Q.  Okay.  So, Mr. Moskal, how were you paid?

18  A.  Most of the time by check.

19  Q.  Okay.  And how often were you supposed to be paid?

20  A.  Yeah, there were gaps in payment.  Sometimes it's a long

21  story.  Sometimes they wouldn't pay for a month.

22  Q.  Okay.  But how often -- at the time of --

23          INTERPRETER TRIPP:  We were paid monthly.  The

24  interpreter has corrected itself.

25          MS. COLUNGA-MERCHANT:  Sorry.

Moskal - direct

1    BY MS. COLUNGA-MERCHANT:

2    Q.  So at the time of hire, did Mr. Bochenek tell you how

3    often he would pay you?

4    A.  Weekly.

5    Q.  Okay.  And were you paid at an hourly rate?

6    A.  Yes.

7    Q.  Okay.  What was your hourly rate?

8    A.  I don't know.  I believe lately it was 17 per hour.

9    Q.  Okay.  And who determined your rate of pay?

10   A.  Bochenek, the boss.

11   Q.  Okay.  And who determined how often you were to be paid?

12   A.  Bochenek.  Who else?

13   Q.  Okay.  And did you receive payments from Masterhaus and

14   Purcon in addition to Master Hand?

15   A.  Yes.

16   Q.  Okay.  And to receive these payments, did you have to

17   submit any additional tax paperwork?

18   A.  Yes.

19   Q.  What documentation -- well, to whom did you submit this

20   documentation to?

21   A.  Everything had to go either to Bochenek or to the

22   secretary.

23        MS. COLUNGA-MERCHANT:  Okay.  And when did he submit

24   this paperwork to Mr. Bochenek or the secretary?

25

Moskal - direct

22

1    BY THE WITNESS:

2    A.  It's so many years.  I don't remember.

3    BY MS. COLUNGA-MERCHANT:

4    Q.  Do you remember if it was at the time you were hired?

5    A.  It's possible.  I don't know.  So many years went by.

6    Q.  Okay.  And who would give you your payments?

7    A.  It varied.  Sometimes we had to go to his room to get the

8    money.  Yeah, we would tell him we had to ask him to pay us,

9    telling him that we have no -- we can't support ourselves.  We

10   have no source to support ourself.

11            MS. COLUNGA-MERCHANT:  And to whom is he referring to

12   when he says him --

13   BY MS. COLUNGA-MERCHANT:

14   Q.  When you say him?

15   A.  I mean Bochenek, my boss.

16   Q.  Okay.  And did you receive any other payments from

17   Mr. Bochenek other than compensation for your hours worked?

18   A.  No.

19   Q.  Okay.  And during the time that you worked for Master

20   Hand, did anyone keep track of the hours you worked?

21   A.  Yes.

22   Q.  Okay.  And who kept track?

23   A.  Bochenek.

24   Q.  Okay.  And how did Mr. Bochenek keep track of the hours

25   you worked?

Moskal - direct

23

1    A.   Because every single week we had to submit the work

2    schedule card that would tell how many hours we worked for

3    particular assignments.

4    Q.   Okay.  And who told you to keep track of your hours in

5    this manner?

6    A.   Boss, Bochenek.

7    Q.   Okay.  And did you submit these time cards to anyone?

8    A.   Yeah.  First of all it was them.  They were delivered to

9    the secretary.

10   Q.   Okay.  And how often did you submit these time cards?

11   A.   Weekly.

12   Q.   Okay.  And did --

13   A.   Most of the time on Mondays.

14   Q.   Okay.  And did you have to submit the time cards to

15   Mr. Bochenek and Master Hand in order to receive payments for

16   your hours worked?

17   A.   Yes.  Yes, because if I wouldn't submit it, I wouldn't get

18   paid.

19   Q.   Okay.

20        MS. COLUNGA-MERCHANT:  So at this time we would like

21   to introduce an exhibit.  So I am marking Plaintiff's Exhibit

22   1 for identification.

23        May the record reflect that I am showing opposing

24   counsel Plaintiff's Exhibit 1 for identification.

25

Moskal - direct

24

BY MS. COLUNGA-MERCHANT:

1  BY MS. COLUNGA-MERCHANT:

2  Q.  Mr. Moskal, I am handing you what's been marked as

3  Plaintiff's Exhibit 1 for identification.  Okay.

4  A.  Yeah, these are my cards.

5  Q.  Okay.  So the question is, Mr. Moskal, do you recognize

6  this exhibit?

7  A.  Yes.

8  Q.  Okay.  Have you ever seen these documents prior to the

9  start of this litigation?

10  A.  Yes.

11  Q.  Okay.  Are these the same documents you submitted to

12  Master Hand to keep track of your hours worked each week?

13  A.  Yes.  Yes.  I mean, no, I mean yes, because these are the

14  things which are after I left the company.

15  Q.  Okay.

16  A.  Yes, these are my cards.

17  Q.  Okay.  So can you turn to trial document number 232.

18  A.  232.  232.

19  Q.  Okay.  Are the hours written down in this document written

20  in your handwriting?

21  A.  Yes.

22  Q.  Okay.  And can you identify for the record the hours that

23  are written in your handwriting?

24  A.  17, which is Army time, 5:00 p.m., 7:00 to 3:00.

25  Q.  And to the right of the hours that he has identified that

Moskal - direct

25

1  he has written down, are these -- these hours also written in

2  your handwriting -- sorry.  So the right of where you have

3  identified you have written down your time, do you -- are

4  those hours written to the right also in your handwriting?

5  A.  No.

6  Q.  Okay.  Do you know who wrote down these hours?

7  A.  I don't know that.  Maybe it was Bochenek and maybe it was

8  secretary.

9  Q.  Okay.

10        THE COURT:  All right.  Counsel, I'm not clear on

11  what handwriting on this exhibit is Mr. Moskal's, if you could

12  clarify that, please.

13        MS. COLUNGA-MERCHANT:  Okay.  I could have him

14  repeat.  I know he had read the 7:00 to 1700.  So he

15  identified that the 7:00 to 1700 is his handwriting.

16        THE COURT:  I'm sorry.

17        MR. WILLIAMS:  Under 232.

18        THE COURT:  All right.  Mr. Moskal, would you just

19  hold that exhibit up for a moment, please.

20        All right.  And could you point to where your

21  handwriting is on that document?

22        THE WITNESS:  This is my handwriting (indicating).

23        THE COURT:  Okay.  Is there other handwriting down

24  along that same --

25        THE WITNESS:  Yes.

Moskal - direct

26

1          THE COURT:  Okay.  But then the numbers closest to

2   the right edge is not your handwriting?

3          THE WITNESS:  That's -- this is not mine.

4          THE COURT:  Okay.  And how about the 48.25 at the

5   bottom?

6          THE WITNESS:  This is mine.  Oh, no it's not.  51

7   it's mine.

8          THE COURT:  51.  Okay.  Thank you.

9          MS. COLUNGA-MERCHANT:  Okay.

10  BY MS. COLUNGA-MERCHANT:

11  Q.  Mr. Moskal, if you could turn to trial document number

12  234.  Okay.  Are these hours written in your handwriting?

13  A.  Yeah, this, and 52.

14  Q.  Okay.  So just can you point out on the document the hours

15  that are written in your handwriting?

16  A.  This is --

17          THE COURT:  Same pattern?

18          THE WITNESS:  This is done by me.

19          Yes.

20          MS. COLUNGA-MERCHANT:  Okay.

21  BY MS. COLUNGA-MERCHANT:

22  Q.  And under the row for Saturday, did you write down where

23  it says "sick paid"?

24  A.  What is the document number?

25  Q.  Sure.  The same one, 234.

1    A.   This is not my handwriting.

2    Q.   Okay.  Do you recall if on this date you received

3    payment -- or sick pay?

4    A.   I don't know.  I don't remember right now.

5    Q.   Okay.  Do you recall if during your time working for

6    Mr. Bochenek and Master Hand if he offered sick pay benefits?

7    A.   I don't know.  I didn't -- I didn't have any of this.  I

8    didn't have the sick pay or sick days.  The only thing I had

9    is vacation.

10   Q.   Vacation.  Okay.  So then if you -- on this row for

11   Saturday, you wrote 7:00 to 1500.  Did you work that time?

12   A.   Yes.

13   Q.   Okay.  And so, Mr. Moskal, do these documents in

14   Plaintiff's Exhibit 1, which were produced by defendants in

15   this litigation, do they accurately reflect the hours and the

16   time period you worked at Master Hand?

17   A.   Yes.  But he had not all of the hours because this is not

18   a complete set of documents.  He has documents also for 2008

19   and 2009.

20   Q.   So this exhibit only represents the time -- so does this

21   exhibit only represent the time period from 2008 to 2009?

22   A.   Yeah.  But he did not deliver all of them.  He has more of

23   it.

24   Q.   And who do you mean by "he"?

25   A.   Bochenek.

1   Q.   Okay.  But just so we're clear, Plaintiff's Exhibit 1 as

2   I've given it to you only represents the time period for 2008

3   and 2009, correct?

4   A.   Yes.

5        MS. COLUNGA-MERCHANT:  At this time, Your Honor, we

6   would like to move to have Plaintiff's Exhibit 1 introduced

7   into evidence.

8        THE COURT:  Any objection, Mr. McNeil?

9        MR. McNEIL:  No.

10       THE COURT:  It will be admitted.

11       MS. COLUNGA-MERCHANT:  Okay.

12    (Plaintiff's Exhibit No. 1 was received in evidence.)

13   BY MS. COLUNGA-MERCHANT:

14   Q.   Mr. Moskal, during the time you worked for Master Hand,

15   did anyone keep track of payments you received?

16   A.   I don't know if anybody kept track of the payments.  They

17   should do this.

18   Q.   Okay.  Mr. Moskal, were you paid for all hours worked from

19   Master Hand?

20   A.   I don't know because it looks like it's chaos here.

21   Q.   Okay.

22   A.   I thought it was insane that Bochenek has chaos and mess,

23   and that's why he didn't pay me all the amounts.

24   Q.   So you were not paid -- were you paid for all the hours

25   that you worked for Master Hand?

Moskal - direct

29

1   A.   No.

2   Q.   Okay.  And to the best of your recollection, how many

3   hours of work were unpaid?

4   A.   767.

5   Q.   Okay.  And did you complain about these unpaid wages to

6   Master Hand?

7   A.   Yes.

8   Q.   And when did you complain about your unpaid wages?

9   A.   Yeah.  While we were working for the construction for

10  Heart, you know, Heart construction.

11          MS. COLUNGA-MERCHANT:  Okay.  And to whom did he

12  complain about his unpaid wages?

13          THE WITNESS:  Three of us went and -- to the boss and

14  we complained about it.  So I complained to him in person.

15  BY MS. COLUNGA-MERCHANT:

16  Q.   And just to be clear, by him, you mean Mr. Bochenek,

17  correct?

18  A.   Yes, Bochenek, yeah, the boss.

19  Q.   And what was Mr. Bochenek's response?

20  A.   He fired us.  Mr. Bochenek fired us.

21  Q.   Okay.  And -- okay.  All right.

22          MS. COLUNGA-MERCHANT:  I am marking Plaintiff's

23  Exhibit 2 for identification.

24          And may the record reflect that I am showing opposing

25  counsel Plaintiff's Exhibit 2 for identification.

Moskal - direct

30

1   BY MS. COLUNGA-MERCHANT:

2   Q.  Mr. Moskal, I am handing you what's been identified as

3   Plaintiff's Exhibit 2 for identification.

4           Okay.  Mr. Moskal, do you recognize this document?

5   A.  Yes.

6   Q.  Okay.  Did you help prepare this document?

7   A.  Yes.

8   Q.  Okay.  And you testified that you worked continuously from

9   1998 through February 2009, correct?

10  A.  Yes.

11  Q.  And you testified you were paid at an hourly rate of $17,

12  correct?

13  A.  Yes.

14  Q.  Okay.  And you testified that the time cards in

15  Plaintiff's Exhibit 1 and your recollection accurately reflect

16  the hours you worked in individual work weeks, correct?

17  A.  Yes.

18  Q.  Okay.  And does this exhibit truly and accurately show the

19  hours you worked, your hourly pay rate and the pay you did not

20  receive for the time period you worked for Master Hand to the

21  best of your recollection?

22  A.  Yes.

23          MS. COLUNGA-MERCHANT:  And, Your Honor, at this time

24  we would like to move this exhibit into evidence.

25          THE COURT:  Let me understand, Counsel.  With respect

Moskal - direct/cross

31

1    to the column on the right-hand, at the far right of the

2    chart.

3               MS. COLUNGA-MERCHANT:  Mm-hmm.

4               THE COURT:  I take it from the entries from November

5    25, 2006 through January 12, 2008, there are not time cards.

6               MS. COLUNGA-MERCHANT:  That's correct, Your Honor.

7    That would be --

8               THE COURT:  So those hours are based on Mr. Moskal's

9    recollection.  And going forward from that point in time with

10   I guess a couple of exceptions, the hours are -- purport to

11   summarize the hours that are set forth on the time cards we

12   just -- Plaintiff's Exhibit 1.

13              MS. COLUNGA-MERCHANT:  Yes, that's correct, Your

14   Honor.

15              THE COURT:  Any objection, Mr. McNeil?

16              MR. McNEIL:  No, Your Honor.

17              THE COURT:  All right.  It will be admitted.

18     (Plaintiff's Exhibit No. 2 was received in evidence.)

19              MS. COLUNGA-MERCHANT:  All right.  And we don't have

20   any further questions at this time.

21              THE COURT:  All right.  Cross-examination,

22   Mr. McNeil.

23              MR. McNEIL:  Could I have two minutes, Your Honor?

24              THE COURT:  Sure.

25              (Off the record.)

1          MR. McNEIL:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3   BY MR. McNEIL:

4   Q.  Good morning, Mr. Moskal.

5   A.  Hello.

6   Q.  Do you have in front of you Plaintiff's Exhibit 2, the

7   chart we just looked at?

8   A.  Yes.

9   Q.  There's a column marked hours worked, pay received.  You

10  see those columns?

11  A.  Yes.

12  Q.  The column that says pay received, did you receive each of

13  the payments that's listed in that column?

14  A.  I don't know.  I don't know.  It's -- it's going on for

15  years.  It's so chaotic.  I don't know from which period of

16  time I was paid because sometimes I was paid weekly.

17  Sometimes biweekly.  Sometimes had to wait a month or longer.

18  Q.  So the recap here is not accurate?

19  A.  The hours are correct, but it's very hard for me right now

20  to tell for which period of time I was paid because if he

21  would pay me weekly, then it would be much easier for me to

22  keep a record.

23  Q.  During the time period, let's say the first half of the

24  project, you were paid on a regular basis and on time; is that

25  correct?

Moskal - cross

33

1    A.   Since I was hired, like, for maybe two, three years.

2    Q.   When did the payments become more drawn out, sporadic?

3    A.   When I -- after -- after six, seven, or eight years of

4    working for him.  About four, five years before I left the

5    company, that's when it started, irregular.

6    Q.   Was the company working on the Sacred Heart project by

7    then?

8              INTERPRETER TRIPP:  How many hours?  I'm sorry.  I

9    couldn't hear.

10   BY MR. McNEIL:

11   Q.   Was the company working on the Sacred Heart project by the

12   time that you just described?

13   A.   No.  No, it was before that.

14   Q.   Okay.  Over the years, how many projects would you say you

15   worked on with Mr. Bochenek?

16   A.   What projects do you have in mind?  I don't understand

17   you.

18   Q.   Any project that involved your skills as a laborer.

19   A.   My boss Bochenek, he should know the best because he kept

20   the documentation of that.

21             MR. McNEIL:  Yes, but I think we're entitled to know,

22   Your Honor, what the witness recalls and certain facts

23   regarding payment on those other jobs.

24             THE COURT:  All right.  He's asking the witness for

25   his estimate of the number of jobs he worked on for

1   Mr. Bochenek.

2        THE WITNESS:  Are we talking about projects, like

3   construction site, or what kind of projects are you talking

4   about?

5   BY MR. McNEIL:

6   Q.  What did you do besides projects at construction sites?

7   A.  Yes, I did.  Of course I did.

8   Q.  Is there any project you performed or in which you

9   participated besides the Sacred Heart project that was not

10  paid to you in full?

11  A.  The payments are overdue from other construction sites,

12  not only this one.  They -- the payments are overdue.  They

13  owe me for Sacred Heart, but there were other construction

14  sites where I worked before that, and they owe me money for

15  that.

16  Q.  Still to this day?  Was the payment late, in other words,

17  or is it not made at all?

18  A.  Yeah, they -- it's difficult for me to explain which

19  construction site was paid or exactly because the delays in a

20  payment for work sometimes were, like, two months.

21  Q.  The summary exhibit, Exhibit 2, the hours that are listed

22  here all were worked at Sacred Heart School; is that right?

23  A.  Excuse me?  Mm-hmm.

24  Q.  Mm-hmm?  Is that a yes?

25  A.  Could you repeat the question?  Because my paper that I

Moskal - cross

35

1   have fell down.

2   Q.  The problem was you answered the question "mm-hmm."  And

3   that's something that's ambiguous when the court reporter is

4   taking down what was said.  So I was asking whether when you

5   said "mm-hmm" that meant "yes"?

6   A.  No, because this paper went down.

7            THE COURT:  Re-ask the first question, Mr. McNeil.

8            THE WITNESS:  Could you repeat the question?

9            MR. McNEIL:  I think I'll maybe just move on.

10  BY MR. McNEIL:

11  Q.  In the last column of Plaintiff's Exhibit 2 says numerous

12  times "recollection."  By that you mean the hours are

13  reconstructed from your own recollection?

14  A.  No, it's not recollect -- recall.  It's not the

15  recollection from the memory.  It's just that's -- everything

16  is correct except I can't say for which exact construction

17  site it is.  Because he also owes me money -- I mean, they owe

18  me money from other jobs that were before that.  So over here

19  is just a summation for how many hours they owe me.

20  Q.  Are any of those jobs reflected in any way on the

21  Exhibit 2?

22  A.  Yeah, they are hours for it.

23  Q.  I'm sorry.  I didn't hear the last part.

24            INTERPRETER TRIPP:  Hours for it.

25

Moskal - cross

36

1   BY MR. McNEIL:

2   Q.  Looking at Exhibit 2 in the left-hand column, it looks

3   like there was never a pay period missed, was there?

4   A.  Excuse me?

5   Q.  Examine column 1 of Exhibit 2.  I believe that there's a

6   paycheck listed for every one of those weeks.

7   A.  All I know that they owe me this money, but I am not able

8   by now to tell for which, what, when.  I was receiving checks.

9   Q.  On a weekly basis?

10  A.  No.

11  Q.  So the recap, to the extent that it says you got a check

12  every week, that's not true, right?

13  A.  No, because every year, all it is, it's a list of hour --

14  listing of hours, for how many hours they owe me.

15  Q.  And that's -- I don't understand what you're saying then

16  with regard to -- the question was regarding the accuracy or

17  the truthfulness of column 1.  It says you got a check every

18  week, and I'm just asking you if that's true.

19  A.  I did not receive -- I did not receive weekly pay.

20  Nobody -- nobody was paid weekly.  Everybody had to go to the

21  room of the boss and beg him for a check.

22  Q.  Could you turn to page 233, Exhibit 2 I guess.  233?

23              THE COURT:  Exhibit 2 or Exhibit 1?

24              MR. McNEIL:  I'm sorry?

25              THE COURT:  Exhibit 2 or Exhibit 1?

Moskal - cross

1       MR. McNEIL:  I think they're numbered so the numbers

2  are the same.

3       MR. WILLIAMS:  Exhibit 1.

4       MS. COLUNGA-MERCHANT:  Exhibit 1.

5  BY MR. McNEIL:

6  Q.  You have in front of you page 233?  Could you tell us

7  again what -- what notations on these sheets are in your

8  handwriting?  All of them?

9       INTERPRETER TRIPP:  Interpreter is speaking.  The

10  witness -- the deponent cannot find the page, 233.

11       THE COURT:  It's the second page of this.

12  BY MR. McNEIL:

13  Q.  Just tell me anything that's not in your handwriting.

14  A.  Yes, it says 233.  I see it.

15  Q.  I'm sorry.  I didn't hear that.

16       THE COURT:  He just acknowledged he's on page 233.

17  Can you ask your question again, please.

18  BY MR. McNEIL:

19  Q.  The question is for you to identify anything on this page

20  that is not in your handwriting.

21  A.  All of this is in my handwriting.

22  Q.  Starting in the upper left-hand corner, the first line,

23  what's that?  What does the first line say?

24  A.  Loading trash into the dumpster.  And then smoothing the

25  surface of the area.

Moskal - cross

38

1   Q.   Where was that work done?

2   A.   It's at that school.

3   Q.   Which school?

4   A.   Sacred Heart.

5   Q.   What does the notation -- it looks like SMERP.  What's

6   that word there?

7   A.   It's Sheridan.  Sheridan.  Because it's by Sheridan.

8   Q.   So was this work related to the Sacred Heart School?

9   A.   Yes.

10  Q.   At the top where it says 7 -- it looks like 7:00 -- is it

11  1530?

12  A.   Yes.

13  Q.   It is?  1530 meaning 3:30 in the afternoon?

14  A.   Yes.

15  Q.   And you would deduct half an hour for lunch; is that

16  right?

17  A.   Yes.

18  Q.   So if we see "Sheridan" written on any of the documents,

19  that's the same as Sacred Heart School?

20  A.   Yes.

21  Q.   On page 234, that's the one that has sick pay next to

22  Saturday.  Could you explain again what that notation is

23  designed to convey?  What does that mean?  The day you were

24  ill that you were paid for anyway that you didn't come to

25  work?

1  A.  No.  No.  I did work.

2  Q.  Why did you make that notation?

3        MR. WILLIAMS:  Objection.  Misstates the testimony.

4  BY THE WITNESS:

5  A.  It was a long time ago.

6        THE COURT:  The testimony, Counsel, was that he did

7  not make that notation.

8  BY MR. McNEIL:

9  Q.  Why did you mark each of these Sheridan?  Was there other

10  work you were doing for Masterhaus at that time?

11  A.  Okay.  So when -- when -- when I was -- needed to

12  participate in the construction work for the school then I was

13  there.  But if there were other jobs where I was needed to do

14  the demolition, then Bochenek would pick me up and we would go

15  to another site.

16  Q.  Describe for me a typical demolition project on the Sacred

17  Heart School project.

18  A.  It's like you need to destroy the drywall, 2x4s.  All the

19  wall has to be taken down.  The windows have to be knocked

20  out.

21  Q.  So tearing down the building, right?  Tearing down the

22  building; is that correct?

23  A.  Yes.

24  Q.  How many people at any given time would work on

25  demolishing the building?

Moskal - cross

40

1   A.  Many.  Many.

2   Q.  More than ten?

3   A.  At a school construction site, I'm sure there were more

4   than ten.

5   Q.  Were you the supervisor of the employees that were doing

6   the demolition?

7   A.  At the school site, I was not a supervisor.

8   Q.  Were you a supervisor somewhere else?

9   A.  Whenever the demolition was done with the use of

10  machinery, I was the one responsible for those people.  I was

11  responsible for those people, the quality of their work and

12  the work to be properly done.

13  Q.  Now, you didn't have to have Mr. Bochenek teach you how to

14  do what's done on that job, did you?

15  A.  Excuse me?

16  Q.  You didn't need for Mr. Bochenek to tell how you to

17  demolish a building, did you?

18  A.  At the beginning I did, yes.

19  Q.  The beginning of what?

20  A.  Because I arrived here, and at the beginning, I didn't

21  know how to work with this machinery.

22  Q.  When you say "at the beginning," at the beginning of what?

23          THE COURT:  The question is at the beginning of what?

24  When he referred to the beginning, what is he referring to?

25          INTERPRETER TRIPP:  The interpreter apologizes.  Two

Moskal - cross

41

1   people were speaking at the same time.

2   BY THE WITNESS:

3   A.  I didn't have the experience.  So at the beginning of my

4   work experience, Bochenek was telling me that I should do this

5   this way or that way because I did not have any experience in

6   this area.  And later on, later on I did the demolition by

7   myself.

8   BY MR. McNEIL:

9   Q.  There's a notation on one of the sheets that refers to

10  Pioneer.  What is Pioneer?

11  A.  So, yeah, that's the place or -- where Bochenek personally

12  resides.  And we were doing some work over there, digging the

13  holes, or I was -- I had to dig two holes with the excavator.

14  Q.  What about -- well, during the last few months of the

15  Sacred Heart School project, the owner stopped making payments

16  to the general contractor; is that correct?

17  A.  I don't know.  It's not my own business.  It's --

18  Q.  I'm sorry.  Did Mr. Bochenek ever tell you that there were

19  problems getting money from the owner?

20  A.  He never -- he did not discuss such things with me.

21  Q.  Do you know of anyone who was paid any wages during the

22  last three months of the Sacred Heart School project?

23  A.  No, I don't.

24  Q.  You're aware, are you not, that the nonpayment of the

25  monies that were coming to the general contractor resulted in

1  their going out of business, the general contractor going out

2  of business?

3  A.  I don't know anything about this.

4  Q.  Do you know about the 40 or so people who weren't paid

5  their paychecks because of the nonpayment of money that was

6  owed to the general contractor?

7  A.  Yeah, I can't say about all people, but my colleagues or

8  co-workers, I know they were not paid, and they were not paid

9  till today.  They still live here in Chicago.

10  Q.  And the reason they aren't paid --

11          THE COURT:  Hold on, Counsel.

12          MR. WILLIAMS:  Your Honor, I just want to point out,

13  I think we have been connected to Poland; is that correct?

14          UNIDENTIFIED SPEAKER:  Yes.

15          THE COURT:  All right.  They should not be connected

16  to observe until we finish this witness.

17          MR. WILLIAMS:  Okay.

18          MR. McNEIL:  The long sequester.

19  BY MR. McNEIL:

20  Q.  So I was asking -- or stating the proposition that the

21  reason that wages weren't paid during the last part of the

22  project was that there was no money?

23  A.  I don't know.  I don't know.  You should ask Bochenek

24  about it.

25  Q.  Do you have any personal knowledge of the termination of

Moskal - cross

43

1  the general contractor at Sacred Heart School?

2  A.  I don't know anything about it.

3  Q.  Well, you know it's a company that was kicked off the job,

4  right?

5  A.  I don't know.  I did leave before that.  Because our boss,

6  Bochenek, he fired us.

7  Q.  Did he say why he was firing you?

8  A.  I don't know.  He told us to go home when we asked him to

9  pay the overdue payments.

10  Q.  And he said he couldn't do that because there was no

11  money, right?

12  A.  I don't know.  He didn't say.  I don't know.  He didn't

13  say anything.  We went there to ask him to get paid, and he

14  said he doesn't have money, go home.  If you don't like it, go

15  home.

16  Q.  No, you said he also said he didn't have any money, right?

17        MR. WILLIAMS:  Your Honor, I'm going to --

18        THE COURT:  Sustained.  Sustained.  He doesn't have

19  to answer the question.  It's been asked and answered.

20  BY MR. McNEIL:

21  Q.  Did you file a lien against the Sacred Heart property?

22  A.  Yes.

23  Q.  How much was the amount of the lien?

24  A.  I don't know.  I don't remember by now.

25  Q.  Before you filed the lien, did you talk to Mr. Bochenek

1    about doing that?

2    A.   No.

3    Q.   "No" did you say?

4    A.   No.

5    Q.   Did you talk to anyone that was employed at the Sacred

6    Heart project about filing a lien?

7    A.   Excuse me?  I don't understand your question.

8    Q.   Did any of the other employees -- any of the other

9    workers, the people that you worked with, say that they were

10   going to file a lien since they weren't paid their wages?

11   A.   Yes.  Yes.  Arishic, he was, like, talking about this with

12   the guy, you know, kind of like general contractor, general

13   person over there about putting a lien, but I did not talk

14   about it directly.

15   Q.   Were you aware that one of the reasons that the general

16   contractor was terminated was the filing of your lien and the

17   other liens that were filed?

18            MR. WILLIAMS:  Your Honor, I'm going to object as to

19   relevance.

20            THE COURT:  Sustained on relevance grounds.

21   BY MR. McNEIL:

22   Q.   When you left -- when you last worked at Sacred Heart, was

23   your portion of the project behind time, ahead of time or

24   about where it should be?

25   A.   I don't know.  I was not in this business.  My boss,

Moskal - cross

1    Bochenek, he should know the best what was happening -- what

2    was happening at the time of the project.  He should have

3    enough to stand up and just tell us.

4    Q.  What I would like to know though is what is your personal

5    knowledge of the status of the job when you left it?

6    A.  No.

7    Q.  Yes.

8    A.  No.

9    Q.  You have no knowledge whatsoever of the status of the work

10   you were working on when you last were at that project?

11   A.  No.

12   Q.  Can you turn to page 131 I guess it is.  It's trial

13   document 0319.

14          MR. WILLIAMS:  Your Honor, that document is not in

15   evidence.

16          THE COURT:  It's in Plaintiff's Exhibit 1, page 0 --

17   what's the page you're looking for, Mr. McNeil?  Trial

18   document 0319?

19          MR. McNEIL:  131.

20          THE COURT:  All right.  There's two numbers on it,

21   000131 and trial document 0319 in Plaintiff's Exhibit 1.

22   BY MR. McNEIL:

23   Q.  There's a notation in Polish --

24          THE COURT:  He's not on the page yet, Counsel.

25          THE WITNESS:  I'm not on this page.

Moskal - cross

46

1        MR. WILLIAMS:  We're using this number.

2        MR. McNEIL:  O319.

3        MR. WILLIAMS:  Trial document 319.

4    BY MR. McNEIL:

5    Q.  Looking at the second line of each of the three slips on

6    the top --

7        THE COURT:  Counsel, he's not on the page yet.

8        MR. McNEIL:  Oh, I'm sorry.

9        THE WITNESS:  I can't find it.  Where is it?

10       THE COURT:  Here, Mr. Moskal, give me the exhibit,

11   please.

12       MR. McNEIL:  It's in the binder.

13       MR. WILLIAMS:  We're using this number that says

14   trial document.

15       THE COURT:  All right, Mr. McNeil.

16   BY MR. McNEIL:

17   Q.  Okay.  O319, the second line, can you just tell me what

18   that means in English?

19   A.  This?  It's -- it says working at school, side on

20   Sheridan.

21   Q.  Okay.  The middle slip on the bottom, see the word Elgin

22   in there and Sheridan?  What does this document say in

23   English?

24   A.  First it's leaving by the track, driving track to Elgin.

25   Then unloading all the materials.  Then loading at the depot

1  again, loading the truck.  Then leaving or driving to Sheridan

2  to the school site and then unloading the materials at the

3  site.

4  Q.  Okay.  Is that at Sacred Heart?

5  A.  Yes.  Sheridan.

6  Q.  Can you give me any other examples of work that you did at

7  Sacred Heart School?  We talked about demolition.  Did you do

8  anything else?  Plumbing, carpentry, painting, anything?

9  A.  No plumbing because I have no knowledge in this area, but

10 I would erect walls.  Yeah, we would do the work, like

11 replacing the tile, replacement of windows.  It's like a

12 variety of different assignments.

13 Q.  Did you ever turn down an assignment from Mr. Bochenek?

14 A.  No.

15 Q.  The $17 hourly rate that you listed in the recap or

16 somebody listed in the recap, where does that come from?

17 A.  I don't understand.  I don't understand your question.  My

18 boss, Bochenek, he gave me such a rate per hour.

19 Q.  Over the years that you worked with Mr. Bochenek, was

20 there ever a time when you were paid an hourly rate of pay

21 prior to the Sacred Heart project?

22           THE INTERPRETER:  Couldn't hear.  Interpreter is

23 asking to repeat, read it.

24           THE COURT:  Was he paid on an hourly rate on projects

25 before the Sacred Heart project?

Moskal - cross

48

1   BY THE WITNESS:

2   A.  Yes.

3   BY MR. McNEIL:

4   Q.  The normal way to be compensated was on a per job basis;

5   is that right?

6   A.  I don't understand your question.

7   Q.  Over the years that you worked for Mr. Bochenek, the

8   manner in which you would be paid was calculated on a per job

9   basis?

10  A.  I had hourly rate.

11  Q.  Always?

12  A.  Always.

13          MR. McNEIL:  One minute, Your Honor.

14    (Counsel conferring.)

15  BY MR. McNEIL:

16  Q.  So you're saying you never were paid, for example, $300 to

17  do a task or $500 flat?  You always had an hourly rate?

18  A.  No.  Well, when we work on doing the decorations for the

19  Polamer office, we were paid -- we were paid for that, but

20  then the Polamer was the one who issued the check.

21  Q.  Polamer is spelled how in English?

22  A.  P-o-l-a-m-e-r.

23  Q.  What was -- that was a social organization or -- social

24  organization?

25  A.  No.  No.  That's the type of business of sending parcels

1    to Poland as well as transferring money.

2    Q.  I'm sorry.  You said sending what to Poland?

3            THE INTERPRETER:  Parcels he said.

4    BY MR. McNEIL:

5    Q.  And was your time for that work volunteered by the

6    company?

7    A.  No.  No.  We -- we worked all entire night to put the

8    decorations.

9    Q.  So this was a single event?

10   A.  Yeah.  As we started in Friday -- Friday afternoon, then

11   we would work entire night till Saturday morning, and Polamer

12   would issue checks for this work.  So Bochenek would give us

13   checks from Polamer.

14   Q.  And that was money that he received from Polamer?

15   A.  I don't know.

16   Q.  Okay.  When is the first time you were paid on a $17

17   hourly rate?

18   A.  I don't know.  I don't remember.  My boss, Bochenek, he

19   should have a documentation.

20   Q.  Were you ever paid in any amount lower than $17 an hour?

21   A.  I don't know.  The confusion is because I never really was

22   paid weekly, on a weekly basis, so it's very confusing because

23   they owe me quite a substantial amount of money.  I don't know

24   anymore how they were counting for what.  If it would be

25   current and I would receive payment in a timely -- on a timely

Moskal - cross

50

1    basis, then I would know.  I would be able to define it.

2    Q.  Now, you and Mr. Bochenek agreed on the $17 hourly rate;

3    is that right?  I mean, after you discussed it, there was some

4    agreement in place that you would be paid at that rate?

5    A.  Excuse me?

6    Q.  When that agreement was made, were you with Mr. Bochenek

7    in person?

8    A.  Yes.  Yes.  He was -- he was my boss so he would decide

9    about things.

10   Q.  When you first had discussions regarding the $17 hourly

11   rate, was there anyone else present during those discussions

12   besides you and Mr. Bochenek?

13   A.  No.  No, it took place at his office.

14   Q.  Can you recall any occasion --

15           THE COURT:  Hold on.  Hold on, Counsel.  Let her

16   finish.

17   BY THE WITNESS:

18   A.  It took place at his, Bochenek's, office.

19   BY MR. McNEIL:

20   Q.  Do you recall anyone else ever being present during a

21   conversation you had with Mr. Bochenek regarding the 17

22   hour -- $17 hourly rate?

23   A.  Nobody was there.  I don't recall.  I don't recall anyone.

24   Q.  Do you recall any occasion in which the $17 hourly rate

25   was put in writing?

Moskal - cross

1   A.  Excuse me?  No.  No, it was not in writing.  It was, like,

2   another.

3   Q.  Were all the checks that are listed in the summary

4   exhibit, were all those checks calculated based upon a $17

5   hourly rate?

6   A.  Yes.

7   Q.  Do you recall having any conversations with Mr. Bochenek

8   about the fact that you would not be paid on Sacred Heart

9   until he received his money?

10  A.  It was the same before Sacred Heart that checks were

11  over -- they were due.

12  Q.  Can you tell me the names of everyone you remember working

13  with on the demolition work at Sacred Heart?

14  A.  Yes.  Kosich, Stkojiac; Kieslawicz, Bogdan.  Who else?

15  Q.  Could you spell the last name, please?

16  A.  Some went back to Poland.  Like Bogdan, he went to Poland.

17  The third one went to Poland.  And also it was -- and then it

18  was another gentleman who worked for Mr. Bochenek.  He still

19  does as a matter of fact.  I'm not sure what his -- the type

20  of job that he was doing.  Then Joe Karpinski also worked at

21  the school project.

22          MR. McNEIL:  Nothing else, Your Honor.

23          THE COURT:  Mr. Moskal, you said earlier that you got

24  vacation time during the time that you worked for

25  Mr. Bochenek; is that correct?

1     THE DEFENDANT:  Yes.  Yes, I had two weeks.

2     THE COURT:  Two weeks each year?

3     THE DEFENDANT:  Yes.  Yes.  Yes, I did.

4     THE COURT:  Was there any other sort of time off that

5  you were entitled to?

6     THE DEFENDANT:  I believe we had three sick days.

7     THE COURT:  Three sick days?

8     THE DEFENDANT:  Yeah, there were three days and also

9  the holy days, like Thanksgiving, were paid.  This was paid.

10    THE COURT:  Okay.  Common holidays?

11    THE WITNESS:  Yes.

12    THE COURT:  Casimir Pulaski Day?

13    THE DEFENDANT:  No, it's today.  They didn't pay for

14 this.  Christmas, Thanksgiving, they were included, Easter,

15 yeah, this type of holidays, they were paid.

16    THE COURT:  Okay.  Thank you.

17    Anything further from plaintiff?

18    MR. WILLIAMS:  Your Honor, we have a few questions on

19 redirect, but we're a little concerned because it's night

20 there and there's a limited amount of time.  Could we ask

21 Mr. Moskal to step down and do the two witnesses in Poland?

22    THE COURT:  Yes.

23    MR. WILLIAMS:  Thank you.

24    THE COURT:  All right.  Mr. Williams, we'll take

25 about three minutes, get the folks set up.  Obviously only one

Jaworski - direct

53

1   of the witnesses should be present at a time, and we'll start

2   back up in three minutes.

3            MR. WILLIAMS:  Okay.  Thank you, Your Honor.

4            (Recess.)

5            THE COURT:  Are we ready to go, Counsel?

6            MR. WILLIAMS:  And, Judge, I did explain that only

7   one should be in the room at a time.  Mr. Bester stepped out.

8   That's Mr. Jaworski.

9            THE COURT:  All right.  Let's get going.

10           MS. COLUNGA-MERCHANT:  Your Honor, at this time, we

11  would like to call Mr. Dariusz Jaworski to testify.

12           THE COURT:  All right.  Mr. Jaworski, can you hear us

13  all right?

14           INTERPRETER KUZNIAR:  Yes.  Yes, we can hear very

15  well.

16           THE COURT:  Okay.  Would you please stand,

17  Mr. Jaworski.

18           Please raise your right hand.

19    (Witness sworn.)

20           THE COURT:  Thank you.  Please be seated.

21           All right.  Counsel.

22       DARIUSZ JAWORSKI, PLAINTIFF'S WITNESS, DULY SWORN,

23                      DIRECT EXAMINATION

24  BY MS. COLUNGA-MERCHANT:

25  Q.  Okay.  Can you please state your name for the record.

Jaworski - direct

54

1   A.   Dariusz Jaworski.

2   Q.   Do you know a person named Walter Bochenek?

3   A.   Yes, I do.

4   Q.   Did you work for Mr. Bochenek from approximately June 2006

5   to February 2009?

6   A.   Yes, I did.

7   Q.   Okay.  Do you remember who hired you?

8   A.   Yes, I do.

9   Q.   And who hired you?

10   A.   Mr. Bochenek hired me.

11   Q.   And were you hired as an individual or as a business?

12   A.   As an individual.

13   Q.   Okay.  Did you understand that Mr. Bochenek was the owner

14   of Master Hand Contractors, Inc.?

15   A.   Yes.

16   Q.   And did you also know that Mr. Bochenek was the owner of

17   Masterhaus Builders, Inc. and Purcon, Ltd.?

18   A.   Yes.

19   Q.   Okay.  For the period of June 2006 to February 2009, did

20   you sign a contract with Master Hand?

21   A.   No, I didn't.

22   Q.   Okay.  For the period of June 2006 to February 2009, did

23   you sign a contract with Masterhaus?

24   A.   No, I didn't.

25   Q.   Okay.  And for the period of June 2006 to February 2009,

Jaworski - direct

55

1 did you sign a contract with Purcon?

2 A. No, I didn't.

3 Q. Okay. Did you have to sign a contract for each job you

4 worked on for each of the three companies?

5 A. No, I didn't have to.

6 Q. Okay.

7   THE COURT: Counsel, I'm sorry. I need to interrupt

8 you.

9   Mr. Williams and counsel, one question just popped

10 into my mind in terms of this interpreter and her

11 qualifications and whether we need to give her an oath. I

12 don't know what arrangements you've made or what her

13 qualifications are to interpret in a U.S. court proceeding.

14   MR. WILLIAMS: Judge, my understanding is that she's

15 certified to interpret in U.S. courts through an international

16 service.

17   THE COURT: All right.

18   Ma'am, have you been certified to interpret in United

19 States courts?

20   INTERPRETER KUZNIAR: No, I don't have such

21 professional certification to interpret in U.S. Courts, but I

22 am a court-certified interpreter in Poland.

23   MR. WILLIAMS: Judge, we have another court-certified

24 interpreter here from earlier this morning.

25   INTERPRETER KUZNIAR: I have some documents, and I

Jaworski - direct

56

1  haven't been given the qualifications from the U.S. court, but

2  I do interpret for Polish courts.

3  THE COURT:  Okay.  Thank you, ma'am.  Just a moment.

4  MR. WILLIAMS:  We could use the translator that we

5  have from this morning who is certified in U.S. courts to

6  translate off of the video hopefully.

7  THE COURT:  That's fine.  I frankly have not ever had

8  an occasion with an interpreter who isn't already certified to

9  translate in U.S. courts.  So I frankly don't know exactly

10  what we would have to do to have this interpreter qualify.  I

11  know there is an oath.  There may be some other paperwork

12  that's involved in the process.  So I think we are going to

13  need to do -- either have this interpreter translate, that's

14  probably the easiest thing, rather than have her vet the

15  translation of the interpreter in Poland.  So I think that's

16  how we need to proceed at this point.

17  MR. WILLIAMS:  Just give me one second here.

18  THE COURT:  Hold on.  We're not quite ready.

19  With respect to documents, who has got the documents

20  in Poland?

21  MR. WILLIAMS:  They have the documents, the set that

22  you have in the binder.

23  THE COURT:  All right.

24  Ma'am, it's no reflection on your qualifications.  I

25  am sure that you are quite skilled and proficient in

Jaworski - direct

57

1   translating, but we must have an interpreter for the

2   proceeding who has been through the certification process here

3   in the United States.  So we are going to have -- we have an

4   interpreter here in the courtroom who will interpret the

5   questions for Mr. Jaworski and his responses.  I would,

6   however, ask that you -- if you can remain present in case we

7   have some difficulty that we might need to call on you to

8   assist with.

9           MR. WILLIAMS:  And I would ask --

10          INTERPRETER KUZNIAR:  All right.  I will stay here.

11  If you need me, just let me know, please.

12          THE COURT:  All right.  Thank you very much for your

13  understanding.

14          INTERPRETER KUZNIAR:  Just let me translate this to

15  Mr. Jaworski, okay?

16          THE COURT:  That's fine.

17          INTERPRETER KUZNIAR:  Thank you.

18          THE COURT:  Okay.

19          All right.  You may proceed, Counsel.

20          MS. COLUNGA-MERCHANT:  Okay.  Thank you, Your Honor.

21  BY MS. COLUNGA-MERCHANT:

22  Q.  So, Mr. Jaworski, for the period of June 2006 to February

23  2009, did you receive payment for your work in checks issued

24  from Master Hand?

25  A.  Yes.

Jaworski - direct

58

1   Q.  Okay.  And before the period of June 2006 to February

2   2009, did you receive payment for your work in checks issued

3   from Masterhaus?

4   A.  Yes.

5   Q.  And for the period of June 2006 to February 2009, did you

6   receive payment for your work in checks issued from Purcon?

7   A.  Yes.

8   Q.  And was there a difference in the work that you were

9   performing for Mr. Bochenek that required you to be paid from

10  these three different companies?

11  A.  No.

12  Q.  Okay.  And just so you know, going forward, I'm going to

13  refer to Master Hand, Masterhaus and Purcon as Master Hand;

14  okay?

15  A.  Okay.

16  Q.  Okay.  Do you remember when you stopped working for

17  Mr. Bochenek and Master Hand?

18  A.  Toward the end of --

19          INTERPRETER TRIPP:  Interpreter didn't --

20  BY THE WITNESS:

21  A.  It's toward the end of 2009.

22          INTERPRETER TRIPP:  And interpreter -- at the same

23  time the deponent kept speaking so he added something, but the

24  interpreter couldn't -- it was overlapping with interpreter

25  speaking.

Jaworski - direct

59

1          THE COURT:  Ask him, please, to repeat his answer,

2  ma'am.

3  BY THE WITNESS:

4  A.  It was on February 28, 2009.

5  BY MS. COLUNGA-MERCHANT:

6  Q.  Okay.  And did you work continuously for Mr. Bochenek and

7  Master Hand from June 2006 through February 28, 2009?

8  A.  Yes.

9          THE COURT:  I'm sorry, Counsel.  You said 2009 --

10  never mind.  I got it.

11          MS. COLUNGA-MERCHANT:  Okay.

12          I'm marking Plaintiff's Exhibit 3 for identification.

13          Let the record reflect I am showing opposing counsel

14  Exhibit 3 for identification.

15  BY MS. COLUNGA-MERCHANT:

16  Q.  And, Mr. Jaworski, Plaintiff's Exhibit 3 is trial document

17  number 417.

18          MR. WILLIAMS:  Your Honor, can I ask the translator

19  to give some instruction as to where to see the number?

20          MS. COLUNGA-MERCHANT:  Sure.  The trial document

21  number can be found at the lower right-hand corner of the

22  document.

23          THE COURT:  Counsel, perhaps identify the document by

24  date and a brief description.

25          MS. COLUNGA-MERCHANT:  Okay.  Yes.

Jaworski - direct

60

1          The document is dated August 25, 2006, and is a

2   letter on Master Hand Contractors, Inc. letterhead.

3          THE WITNESS:  Yes, I found the document.

4   BY MS. COLUNGA-MERCHANT:

5   Q.  Okay.  So now that you have Plaintiff's Exhibit No. 3 in

6   front of you, do you recognize this exhibit?

7   A.  Yes, I do.

8   Q.  And have you ever seen this document prior to the start of

9   the litigation?

10  A.  Yes.

11  Q.  And what is this document?

12  A.  This document confirms or acknowledges that I am an

13  employee of the company called Master Hand Contractors.

14  Q.  Okay.  And did you ask Mr. Bochenek to write this letter?

15  A.  Yes.

16  Q.  And what was his response to your request?

17  A.  That he's going to write such document.

18  Q.  Can you repeat the -- your answer?

19          INTERPRETER KUZNIAR:  Mr. Bochenek agreed to issue

20  this document.

21  BY MS. COLUNGA-MERCHANT:

22  Q.  Okay.  And are you familiar with Mr. Bochenek's signature?

23  A.  Yes.

24  Q.  And how so?

25  A.  It was on all the checks.

Jaworski - direct

61

1   Q.   Okay.  Is this his signature at the end of this letter?

2   A.   Yes.

3   Q.   And is Plaintiff's Exhibit 3 an accurate representation of

4   the original letter Mr. Bochenek signed?

5   A.   Yes.

6          MS. COLUNGA-MERCHANT:  Your Honor, at this time, I

7   would like to offer Plaintiff's Exhibit 3 into evidence.

8          THE COURT:  Any objection?  Mr. McNeil, any

9   objection?

10         MR. McNEIL:  No.

11         THE COURT:  All right.  It will be admitted.

12         MS. COLUNGA-MERCHANT:  Okay.

13    (Plaintiff's Exhibit No. 3 was received in evidence.)

14  BY MS. COLUNGA-MERCHANT:

15  Q.   Mr. Jaworski, did you work for any other companies while

16  you worked for Master Hand?

17  A.   Yes.

18  Q.   And what other companies did you work for?

19  A.   For Polamer.

20  Q.   And how did you start working for Polamer?

21  A.   The wife of Mr. Bochenek, she worked for a company called

22  Polamer, the company called Polamer.  So we were employees of

23  Mr. Bochenek.

24  Q.   Did Mr. Bochenek direct you to work for Polamer?

25  A.   Yes.

Jaworski - direct

1   Q.  And did Mr. Bochenek direct your work assignments while

2   you worked for Polamer?

3   A.  Yes.

4   Q.  Okay.  And while you worked for Master Hand, could you

5   have worked for other companies without the authorization of

6   Mr. Bochenek?

7   A.  No.

8   Q.  And while you were employed by Mr. Bochenek and Master

9   Hand, were you aware of any other people who worked for

10   Mr. Bochenek?

11   A.  Yes.

12   Q.  Can you name some of the people that worked for

13   Mr. Bochenek while you were working for him?

14   A.  Yes.

15   Q.  Okay.  Can you give me those names, please.

16   A.  Kieslawicz, Bogdan; Baramski, Lukasz; Moskal, Bogdan,

17   Bester, Ryszard.

18   Q.  Okay.  And what --

19   A.  Kosich, Stanislaw, yes.  Karpinski, Joseph.

20   Q.  Okay.  And what types of jobs did they do for

21   Mr. Bochenek?

22   A.  Most of it -- most of the time in a construction field.

23   Q.  Okay.  Do you recall a person by the name of Agnes

24   Kedzierski who worked for Mr. Bochenek?

25   A.  Yes.

Jaworski - direct

63

1    Q.  And who is she?

2    A.  Secretary.  Okay.  She has -- she had two functions.  She

3    worked as a secretary and bookkeeper at the same time.

4    Q.  Okay.  Do you recall someone by the name of Bogdan

5    Kulikowski who worked for Mr. Bochenek?

6    A.  Yes.

7    Q.  And who is he?

8    A.  He was a deputy of Mr. Bochenek.

9    Q.  Okay.  And what was your job title when you worked for

10   Mr. Bochenek at Master Hand?

11   A.  I worked as an electrician and mechanic.

12   Q.  Okay.  And what type of work did you do in that capacity

13   for Mr. Bochenek at Master Hand?

14   A.  Okay.  Master Hand, I would repair a variety of devices,

15   like I would repair cars.  I would repair excavator, the

16   construction site and machinery.

17   Q.  Okay.  And who gave you your job assignments?

18   A.  Mr. Bochenek.

19   Q.  And when would Mr. Bochenek give you your job assignments?

20   A.  Every morning.  It was in the morning.  Sometimes in the

21   afternoon.  Sometimes in the evening.  Sometimes over the

22   phone.

23   Q.  Okay.  So would you be given your job assignments on a

24   daily basis?

25   A.  Yes.

Jaworski - direct

64

1   Q.   Okay.  And did someone supervise your work at Master Hand?

2   A.   Mr. Bochenek and Mr. Kulikowski.

3   Q.   Okay.  And did you receive instructions or directions on

4   how to complete your job assignments?

5   A.   Yes.

6   Q.   And by whom did you receive those instructions?

7   A.   Mr. Bochenek and Mr. Kulikowski.

8   Q.   And how would they instruct or direct your work?

9   A.   They were telling me at work what I supposed to do.  Oh,

10  and also they instructed me how I should conduct or how I

11  should do or complete my work, my job.

12  Q.   Can you give us an example of such an instruction on how

13  you should complete your job?

14  A.   If we're talking about the jobs related to mechanical

15  jobs?

16  Q.   Okay.  Can you give -- go ahead.

17  A.   Okay.  So they would tell me, you need to repair this or

18  that device.  For example, the engine or motor is faulty and

19  needs to be repaired or the pump in this device.

20  Q.   Okay.  And did you decide which materials would be used to

21  complete your job assignments?

22  A.   No.

23  Q.   Did you decide which tools would be used to complete your

24  job assignments?

25  A.   If we're talking about that job at the school, then no.

Jaworski - direct

65

1  But if we are talking about specifically mechanical jobs,

2  projects, yes.

3  Q.  So did you decide for the mechanical jobs which tools

4  would be needed to complete your job assignments?

5  A.  Yes.  Yes, I did.  However, all the tools were available

6  for us at the depot.

7  Q.  Okay.  And just to clarify, so for -- you testified that

8  you could not decide which materials would be used to complete

9  your job assignments.  Is that both the mechanical jobs and at

10 Sacred Heart?

11 A.  Yes.

12 Q.  Okay.  And so for those job assignments where you did not

13 decide which materials or the tools were -- that were required

14 to complete your job, who made that decision?

15 A.  Mr. Bochenek and Mr. Bogdan Kulikowski.

16 Q.  Okay.  And did you provide the materials to complete your

17 job assignments?

18 A.  No.

19 Q.  And did you have to purchase tools or other supplies to

20 complete your job assignments?

21 A.  No.

22 Q.  Okay.  And so who purchased the materials to complete your

23 job assignments?

24 A.  Mr. Bochenek, Mr. Kulikowski, and from time to time,

25 Kieslawicz, Bogdan.

Jaworski - direct

66

1    Q.   Okay.  And Mr. Bochenek, Mr. Kulikowski and the other

2    person, do they also purchase the tools that you needed to

3    complete your job assignments?

4    A.   Yes.

5    Q.   Okay.  Did you ever have to -- sorry.  Scratch that.

6         Could you decide to purchase materials to perform

7    your tasks without prior approval or authorization?

8    A.   No.

9    Q.   And from whom did you have to obtain prior approval or

10   authorization if you wanted to purchase materials?

11   A.   Either Mr. Bochenek or Mr. Bogdan Kulikowski.

12   Q.   Okay.  And did you use your own tools to perform your job

13   duties?

14   A.   No.

15   Q.   And did you have your own employees?

16   A.   No.

17   Q.   And did you have the authority to hire your own employees?

18   A.   No.

19   Q.   Okay.  Mr. Jaworski, did you have a set schedule while you

20   worked for Master Hand?

21   A.   Yes.

22   Q.   So what was your typical work schedule?

23   A.   Okay.  So it would be from Monday through Friday from 7:00

24   to 17 Army time, which is 5:00 p.m., and Saturday is from 7:00

25   to 3:00, or 2:00 or 1:00 p.m., which, yes, was established.

Jaworski - direct

67

1   Q.   Okay.  So who set that schedule?

2   A.   Mr. Bochenek.

3   Q.   And when did Mr. Bochenek give you this schedule?

4   A.   At the time when he was hiring me.

5   Q.   Okay.  So would your schedule ever change?

6   A.   Yes.

7   Q.   And when would your schedule change?

8   A.   Sometimes I had to work -- there were times also -- it all

9   varied and depended on a need.  So some days I would have to

10  work longer.  Sometimes I had to work at night.  It varied.

11  Q.   And who would inform you of the schedule change?

12  A.   Mr. Bochenek.

13  Q.   Okay.  And when would Mr. Bochenek inform you of that

14  schedule change?

15  A.   It was before the workday or if we had to do something

16  different than normal.

17  Q.   And by "before the workday," are you saying before the

18  change in the schedule or the same day of the change in the

19  schedule?

20  A.   On the very same day.  It's on the very same day, although

21  it did happen that on and off we would be informed ahead of

22  time about the change in schedule.

23  Q.   Could you decide to come into work later than your

24  scheduled start time?

25  A.   Yes.

Jaworski - direct

68

1   Q.  So you could decide to -- that you wanted to start at 8:00

2   a.m. instead of 7:00 a.m.?

3   A.  No.

4   Q.  Okay.  If -- okay.  So if you wanted -- if you -- scratch

5   that.

6           So who would -- did you need to obtain permission to

7   change your schedule?

8   A.  Yes, I had to obtain permission.

9   Q.  And from whom did you need that permission?

10  A.  From Mr. Bochenek or Mr. Kulikowski.

11  Q.  Okay.  And so that you would need Mr. Bochenek or

12  Mr. Kulikowski's permission to leave earlier than your

13  scheduled end time?

14  A.  Yes.

15  Q.  Okay.  So you testified earlier that your typical work

16  schedule was Monday through Friday from 7:00 a.m. until 5:00

17  p.m. and Saturday from 7:00 a.m. to 1:00 p.m.; is that

18  correct?

19  A.  Yes.

20  Q.  Okay.  And so approximately how many hours did you work in

21  that typical work week?

22  A.  53, 54.

23  Q.  And, Mr. Jaworski, how were you paid?

24  A.  Checks.

25  Q.  Okay.  And how often were you supposed to be paid?

Jaworski - direct

69

1   A.   Weekly.  Checks should be issued weekly.

2   Q.   Okay.  And were you paid on an hourly basis?

3   A.   Yes.

4   Q.   And what was your hourly rate?

5   A.   At the very beginning when I started working there, I had

6   $12 per hour.  And then by the end of my working for them, it

7   was 15.

8   Q.   Okay.  Do you recall how often you would receive pay

9   raises?

10  A.   Yes, I do remember.

11  Q.   Okay.  Can you tell me when you received a raise from $12

12  an hour?

13  A.   Yes, I do remember.

14  Q.   Okay.  So when did -- when did you receive your first

15  raise?

16  A.   It was in the month -- month -- month of November 2006.

17  Q.   And how much was your salary -- was your hourly rate

18  increased?

19  A.   A dollar.

20  Q.   Okay.  So then --

21  A.   A dollar.

22  Q.   Okay.  So beginning in November of 2006, you were earning

23  $13 per hour?

24  A.   Yes.

25  Q.   Can you tell me the next time you received a raise?

Jaworski - direct

70

1   A.   In January 2008.

2   Q.   Okay.  And how much did your salary or -- or your hourly

3   rate increase by?

4   A.   $14.

5   Q.   Okay.  And when was the next date you received a pay

6   raise?

7   A.   June 2008.

8   Q.   And when was -- by how much did your hourly rate increase

9   by?

10  A.   $15.

11  Q.   And so then by the time you stopped working for Master

12  Hand in February of 2009, your hourly rate was $15 an hour,

13  correct?

14  A.   Yes.

15  Q.   Okay.  And who determined your rate of pay?

16  A.   Mr. Bochenek.

17  Q.   Okay.  And who determined how often you were to be paid?

18  A.   Mr. Bochenek.

19  Q.   Okay.  And when did Mr. Bochenek determine your rate of

20  pay and how often you would be paid?

21  A.   I don't understand your question.

22  Q.   Sure.  So when did Mr. Bochenek tell you what your hourly

23  rate was going to be?

24  A.   At the time of the hiring, at the beginning, and then

25  later on when I was already working for him.

Jaworski - direct

1   Q.   Okay.  And did Mr. Bochenek tell you how often you would

2   be paid at the time of hire as well at the very beginning?

3   A.   Yes.

4   Q.   Okay.  And did you receive payments from Masterhaus and

5   Purcon in addition to Master Hand?

6   A.   Yes.

7   Q.   Okay.  And in order to receive these payments from Master

8   Hand and Purcon, did you have to submit additional paperwork

9   to Masterhaus and Purcon?

10  A.   From the -- from every job that was -- that was assigned.

11  Q.   So did -- so let me just rephrase that.

12          So in order to get a payment from Masterhaus and

13  Purcon, did you have to submit additional tax information to

14  someone from Masterhaus or Purcon in order to get those

15  payments?

16  A.   I don't understand your question.  I'm not sure what you

17  mean.

18  Q.   Sure.  So when you first -- at the time of hire for Master

19  Hand Contractors, did you submit any tax documentation to

20  Mr. Bochenek?

21  A.   Yes.

22  Q.   And so after submitting this paperwork to Mr. Bochenek, in

23  order to receive payments from Masterhaus and Purcon, did you

24  have to submit new tax information forms to Mr. Bochenek?

25  A.   It's hard to say because Mr. Bochenek, Mr. Bochenek was

Jaworski - direct

72

1  the sole owner of all these companies.

2  Q.  Okay.  So you didn't have to resubmit a W-9 form or any

3  other tax documents to Mr. Bochenek after that initial

4  submission?

5  A.  No.

6  Q.  Okay.  And who would give you your payments?

7  A.  Mr. Bochenek and Mr. Kulikowski.

8  Q.  Okay.  And, Mr. Jaworski, during the time that you worked

9  for Master Hand, did anyone keep track of the hours you

10  worked?

11  A.  When I worked -- nobody, no.  But when I worked at the

12  school, Mr. Karpinski would keep track of my hours.

13  Q.  Okay.  And how would Mr. Karpinski keep track of your

14  hours?

15  A.  Mr. Karpinski, he was hired by Mr. Bochenek.  So all this

16  time, he was at the school site.

17  Q.  Okay.  Would he write down the hours that you came in and

18  you -- you signed out?

19  A.  Yes, he would write it down.  Yeah.

20  Q.  Okay.  And Mr. Jaworski, did you keep track of the hours

21  you worked?

22  A.  Yes, I did.  I did keep track.

23  Q.  Okay.  And how did you keep track?

24  A.  I would use the time sheets or worksheets.

25  Q.  And who told you to keep track of your hours in this

Jaworski - direct

73

1    manner?

2    A.   Mr. Bochenek at the time of hiring me.

3              MS. COLUNGA-MERCHANT:   Okay.  So I'm marking

4    Plaintiff's Exhibit 4 for identification.

5              And may the record reflect that I am showing opposing

6    counsel Plaintiff's Exhibit 4 for identification.

7    BY MS. COLUNGA-MERCHANT:

8    Q.   And, Mr. Jaworski, Plaintiff's Exhibit 4 is trial document

9    number 375 and 376.  It's a sheet dated October 10, 2007 on

10   Master Hand Contractors, Inc. letterhead.

11   A.   I found it.  I found the document.

12   Q.   Okay.  So, Mr. Jaworski, do you recognize this exhibit?

13   A.   Yes, I do recognize.

14   Q.   Okay.  And have you ever seen this document prior to the

15   start of the litigation?

16   A.   Yes.

17   Q.   And what is this document?

18   A.   Yeah.  It relates -- it's addressing all the employees of

19   the company regarding the materials and regarding -- oh, and

20   also hours --

21             INTERPRETER TRIPP:   Yeah.  Go ahead.

22   BY THE WITNESS:

23   A.   Okay.  In this document there's a description how we

24   should fill out the time sheet or the worksheet.

25

Jaworski - direct

74

1   BY MS. COLUNGA-MERCHANT:

2   Q.   Okay.  And when did you receive this document?

3   A.   In October 2007.

4   Q.   Okay.  And who gave you this document?

5   A.   I don't remember.

6   Q.   Okay.  Does this document instruct you on how to keep

7   track of your hours worked?

8   A.   Yes.

9   Q.   And based on this document, is this how you tracked your

10  hours worked while you worked for Master Hand?

11  A.   Yes.

12  Q.   Okay.  And is Plaintiff's Exhibit 4 an accurate

13  representation of the instructions as you originally received

14  them?

15  A.   Yes.

16       MS. COLUNGA-MERCHANT:  Your Honor, at this time, I

17  would like to offer into evidence Plaintiff's Exhibit 4.

18       MR. McNEIL:  No objection.

19       THE COURT:  It will be admitted.

20    (Plaintiff's Exhibit No. 4 was received in evidence.)

21  BY MS. COLUNGA-MERCHANT:

22  Q.   Okay.  And, Mr. Jaworski, did you submit your time cards

23  to anyone at Master Hand?

24  A.   Yes.

25  Q.   And to whom did you submit the time cards to?

Jaworski - direct

75

1   A.   Secretary or Mr. Kulikowski or Mr. Bochenek.

2   Q.   Okay.  And how often would you submit your time cards?

3   A.   Weekly.

4   Q.   Okay.  And did you have to submit the time cards to Master

5   Hand in order to receive the payments for your hours worked?

6   A.   Yes.

7   Q.   Okay.

8           MS. COLUNGA-MERCHANT:  So I'm currently marking

9   Plaintiff's Exhibit 5 for identification.

10          INTERPRETER TRIPP:  5?

11          MS. COLUNGA-MERCHANT:  5.

12          May the record reflect that I'm showing plaintiff's

13  counsel Plaintiff's Exhibit 5.

14  BY MS. COLUNGA-MERCHANT:

15  Q.   And, Mr. Jaworski, Plaintiff's Exhibit 5 begins with trial

16  document number 118 and ends with 231.

17  A.   Could you repeat these numbers?

18  Q.   Sure.  Sorry.  It's 118 through 231.

19          THE COURT:  The copies of the time cards.

20          MS. COLUNGA-MERCHANT:  Right.

21          THE WITNESS:  Time cards?

22  BY MS. COLUNGA-MERCHANT:

23  Q.   Yes, the copies of your time cards.

24  A.   Yes.

25  Q.   Okay.  So do you recognize this exhibit, Mr. Jaworski?

1   A.  Yes.

2   Q.  And have you ever seen these documents prior to the start

3   of the litigation?

4   A.  Yes.

5   Q.  Okay.  Are these the same documents that you submitted to

6   Master Hand to keep track of your hours worked each week?

7   A.  Yes.  Yes.

8   Q.  Okay.  Can you please turn to trial document number 120 in

9   this exhibit.

10              THE COURT:  The third page of the exhibit.

11              THE WITNESS:  It's not really numbered there.  They

12  are not in order.

13  BY MS. COLUNGA-MERCHANT:

14  Q.  It should say trial document number and then 120.

15  A.  Yes.

16  Q.  Okay.  You have it?  Are the hours written down on this

17  document written in your handwriting?

18  A.  Work hours, yes.  But I can see over here correction.

19  Q.  Okay.  Can you -- holding up the document, can you point

20  to the hours that are written in your handwriting?

21  A.  (Indicating).

22              THE COURT:  Mr. Jaworski, are you pointing to the

23  numbers that are circled or the numbers to the right of the

24  circles?

25              THE WITNESS:  These that are circled.

Jaworski - direct

77

1          THE COURT:  All right.  So the circles are your --

2     the numbers within the circles are your handwriting?

3          THE WITNESS:  Not all of them.  It's mixed up.

4     BY MS. COLUNGA-MERCHANT:

5     Q.  Okay.  So in -- so for which are the numbers that are

6     mixed up, the ones that are not your handwriting in the

7     circles?

8     A.  Eight and a half.  Eight and a half 2009.

9          INTERPRETER TRIPP:  One second.

10    BY THE WITNESS:

11    A.  2/19/2009.

12         INTERPRETER TRIPP:  Go ahead.

13    BY THE WITNESS:

14    A.  Nine and a half?  Those are the numbers.  Or eight and a

15    half and nine and a half?

16    BY MS. COLUNGA-MERCHANT:

17    Q.  Okay.  So just to clarify, are the dates -- are the

18    numbers in the circles not your handwriting for the dates of

19    February 18, 2009 and February 19, 2009?

20    A.  Yes.

21    Q.  Okay.  And is it also your -- is it your handwriting for

22    also those dates February 18, 2009 and February 19, 2009, so

23    numbers 730 and 1630 for both of those dates?

24    A.  Which card are you talking about now?

25    Q.  Sure.  The same one.  Trial document number 120.

1   A.  Yes.

2   Q.  So on the right to where you've identified that you wrote

3   down the hours worked, to the right of those --

4   A.  Yes, okay.

5            INTERPRETER TRIPP:  The answer was:  Meanwhile, it's

6   not my writing.  It's not my handwriting.

7   BY MS. COLUNGA-MERCHANT:

8   Q.  So the hours of 7:30 to 1630 for both February 18th and

9   February 19, 2009, are not in your handwriting, correct?

10  A.  Yes, this is not my handwriting.

11  Q.  Okay.  Do you know whose handwriting that is?

12  A.  I don't know.

13  Q.  Okay.  Do these documents which were produced by

14  defendants in the litigation accurately reflect the hours you

15  worked at Master Hand?

16  A.  No.

17  Q.  How are they not -- I'm sorry.  So no, that they're not

18  accurate, or no...

19  A.  Okay.  The hours that I entered -- one second.  That I

20  entered by myself, they are correct.  However, the correction

21  that somebody made on the page are not correct.

22  Q.  Okay.  But in -- for these -- for this exhibit, are these

23  documents an accurate representation of the time cards that

24  you submitted to Mr. Bochenek?

25  A.  Yes.

Jaworski - direct

79

1  Q.  Okay.  And for what time period are these time cards for?

2  A.  Yeah.  That's the period of time I was hired and worked

3  for Mr. Bochenek, 2006 to 2009.

4  Q.  So this exhibit has the time cards for the entire time

5  period you worked for Mr. Bochenek?

6  A.  No.

7  Q.  Okay.  So in this exhibit, what is the time period that

8  these time cards cover?

9  A.  2007, 2008, 2009.  Okay.  Until 2009.

10  Q.  Until 2009.  Okay.

11          MS. COLUNGA-MERCHANT:  So at this time, Your Honor,

12  we would like to introduce Plaintiff's Exhibit 5 into

13  evidence.

14          THE COURT:  Any objection?

15          MR. McNEIL:  No, Your Honor.

16          THE COURT:  It will be admitted.

17          MS. COLUNGA-MERCHANT:  Okay.

18    (Plaintiff's Exhibit No. 5 was received in evidence.)

19  BY MS. COLUNGA-MERCHANT:

20  Q.  Mr. Jaworski, during the time that you worked for Master

21  Hand, did anyone keep track of the payments you received?

22  A.  Mr. Bochenek or secretary.  I don't know.

23  Q.  Okay.  Do you know how Mr. Bochenek or his secretary would

24  have kept track of your hours -- of the payments you received?

25  A.  Yes.

Jaworski - direct

1    Q.   Okay.  So how did they keep track?

2    A.   I think checking the cards.  What is the name of these

3    cards?  One moment.  They call it payment cards or something

4    like that.

5    Q.   Okay.  And that's okay.  If that's how you recall they

6    kept track, that's fine.

7            So, Mr. Jaworski, were you paid for all hours worked

8    for Master Hand?  Were you paid for all hours worked?

9    A.   No.

10   Q.   And to the best of your recollection, how many hours of

11   work were unpaid?

12   A.   Up to 500 hours.

13   Q.   Okay.  And did you complain about these unpaid wages to

14   anyone at Master Hand?

15   A.   Yes.

16   Q.   And to whom did you complain?

17   A.   Mr. Bochenek and Mr. Kulikowski.

18   Q.   And when did you complain to them?

19   A.   Through the entire time of employment for Mr. Bochenek.

20   Q.   And what would be his response to your complaints?

21   A.   That soon we will be paid or...

22   Q.   Okay.  And did you continue to work for Mr. Bochenek

23   despite not being paid for all the hours worked?

24   A.   Yes.

25            MS. COLUNGA-MERCHANT:  Okay.  I am marking

Jaworski - direct

81

1   Plaintiff's Exhibit No. 6.

2           May the record reflect I'm showing opposing counsel

3   Plaintiff's Exhibit No. 6.

4   BY MS. COLUNGA-MERCHANT:

5   Q.  Mr. Jaworski, Plaintiff's Exhibit 6 is trial document

6   number 446 through 449.  It's the summary exhibit of backpay

7   and statutory damages.

8   A.  Yes, I can see it.

9   Q.  Mr. Jaworski, have you seen this document before?

10  A.  Yes.

11  Q.  And did you help prepare this document?

12  A.  Yes.

13  Q.  And you testified that you worked continuously from June

14  2006 through February 2009, correct?

15  A.  Yes.

16  Q.  And you testified that from November 2006 to January 2008,

17  you were paid at $13 per hour, correct?

18  A.  Yes.

19  Q.  And also you testified from January 2008 to June 2008, you

20  were paid $14 per hour, correct?

21  A.  Yes.

22  Q.  And you testified from June 2008 to February 2009, you

23  were paid $15 per hour, correct?

24  A.  Yes.

25  Q.  And you testified that the time cards accurately reflect

Jaworski - direct

1    the hours that you worked in individual work weeks for the

2    time period of approximately 2008 to February 2009; is that

3    correct?

4    A.  Yes.

5    Q.  Okay.  And does this exhibit truly and accurately show the

6    hours you worked, your hourly pay rate and the pay you did not

7    receive for the time period you worked for Master Hand, to the

8    best of your recollection?

9    A.  Yes.

10          MS. COLUNGA-MERCHANT:  Your Honor, at this time, I

11   would like to move Plaintiff's Exhibit 6 into evidence.

12          THE COURT:  Any objection?

13          MR. McNEIL:  No.

14          THE COURT:  It will be admitted.

15     (Plaintiff's Exhibit No. 6 was received in evidence.)

16   BY MS. COLUNGA-MERCHANT:

17   Q.  So, Mr. Jaworski, looking at Plaintiff's Exhibit No. 6, so

18   page 446.  Do you see the column where it has pay received?

19   It's the fourth column from the left.

20   A.  What number was it; 446?

21   Q.  Yes, 446.

22          THE COURT:  The same exhibit we were just talking

23   about.

24          THE WITNESS:  Yeah, I have it.

25

Jaworski - direct

83

1    BY MS. COLUNGA-MERCHANT:

2    Q.   Okay.  So do you see the fourth column from the left where

3    it says pay received?

4    A.   Yes.

5    Q.   So by and large, are these amounts in this column the

6    amounts you would typically receive from Mr. Bochenek?

7    A.   Yes.

8    Q.   Okay.  And we calculated this by multiplying the rate of

9    pay by the number of hours that you recollected that you

10   worked; isn't that right?

11   A.   Yes.

12   Q.   Okay.  And you didn't receive overtime pay while you

13   worked for Master Hand, correct?

14   A.   The over -- overtime was paid at the same regular rate.

15   Q.   Okay.  So it's true that you didn't get time and a half

16   for any hours worked over 40 in one work week?

17   A.   Correct.  Yes.

18   Q.   Okay.  And is it also true that there were weeks in which

19   you did not receive a check for your work, for your hours

20   worked with Master Hand?

21   A.   Yes.

22   Q.   Okay.  And if you turn to the last page in this exhibit,

23   so 449.

24   A.   Yes.

25   Q.   Okay.  In the second column where it says wages owed.

1   A.  Yes.

2   Q.  Okay.  Is this the amount of wages that you were not paid

3   for your hours at Master Hand?

4   A.  Yes.

5           MS. COLUNGA-MERCHANT:  Okay.  That's it, Your Honor.

6           THE COURT:  All right.  I know the hour is getting

7   later in Poland, but we do need to give folks here a little

8   break for lunch.  So we're going to break for a half an hour.

9   We'll try to resume at 20 after 1:00, and we'll resume with

10  the cross-examination.

11          MR. WILLIAMS:  Thank you, Your Honor.

12          THE COURT:  So half an hour break.

13          MR. WILLIAMS:  And just so Your Honor knows, we have

14  confirmed that we have access to this room until 3:00 p.m. our

15  time today.

16          THE COURT:  Okay.

17          MR. WILLIAMS:  We'll see how we do.

18          THE COURT:  We'll see where we get to.

19          MR. WILLIAMS:  Okay.  Thank you, Judge.

20          THE COURT:  Let's resume at 20 after the hour.

21          (Lunch recess.)

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3   DARIUSZ JAWORSKI, BOGUSLAW        )
     MOSKAL and RYSZARD BESTER,        )
 4                                     )
                       Plaintiffs,     )
 5                                     )
     -vs-                              )  Case No. 09 C 7255
 6                                     )
     MASTER HAND CONTRACTORS, INC.,    )  Chicago, Illinois
 7   MASTERHAUS BUILDERS, INC.,        )  March 7, 2016
     PURCON, LTD., and WALTER F.       )  1:21 p.m.
 8   BOCHENEK, individually,           )
                                       )
 9                       Defendants.   )

10

                     TRANSCRIPT OF PROCEEDINGS - TRIAL
11                             VOLUME 1B
               BEFORE THE HONORABLE JOHN J. THARP, JR.
12
     APPEARANCES:
13
     For the Plaintiff:      MR. CHRISTOPHER J. WILLIAMS
14                           WORKERS' LAW OFFICE, P.C.
                             53 West Jackson Street, Suite 701
15                           Chicago, Illinois  60604

16                           MS. LYDIA COLUNGA-MERCHANT
                             RAISE THE FLOOR ALLIANCE - LEGAL DEPT.
17                           1 North LaSalle Street, Suite 1275
                             Chicago,  Illinois  60602
18
     For the Defendant:      MR. DONALD J. McNEIL
19                           THE LAW OFFICE OF DONALD J. McNEIL
                             617 West Fulton Street
20                           Chicago, Illinois  60661

21   Also Present:           MS. URSULA TRIPP, Interpreter
                             MS. MALGORZATA KUZNIAR, Interpreter
22   Court Reporter:
                       KELLY M. FITZGERALD, CSR, RMR, CRR
23                          Official Court Reporter
                        United States District Court
24               219 South Dearborn Street, Room 1420
                          Chicago, Illinois  60604
25                     Telephone:  (312) 818-6626
                    kelly_fitzgerald@ilnd.uscourts.gov
```

1          THE COURT:  All right.  Are we ready to resume?

2          MR. WILLIAMS:  I'm going to ask Mr. Bester to leave

3    the room again.

4          THE COURT:  Yeah, just one second.  Let's get

5    ourselves organized here.

6          All right.  Realistically, it's 1:20.  I assume

7    you're going to have a comparable cross-examination,

8    Mr. McNeil?

9          MR. McNEIL:  I think it will be shorter.

10          THE COURT:  Then maybe we'll get there.  We'll see

11   where it goes.

12          MR. WILLIAMS:  I think we're going to be shorter on

13   the third witness as well.

14          THE COURT:  Then let's get started.

15          MR. WILLIAMS:  Did Mr. Bester leave the room?

16          THE COURT:  All right.  Mr. McNeil, you may begin

17   your cross-examination.

18          MR. McNEIL:  Thank you, Your Honor.

19                          CROSS-EXAMINATION

20   BY MR. McNEIL:

21   Q.  Good afternoon, Mr. Jaworski.

22          Would you turn in your binder to trial document

23   number 399, please.  Let me know when you have that in front

24   of you.

25          THE COURT:  All right.  Mr. McNeil, that's not an

Jaworski - cross

87

1    exhibit that the witness had been previously shown.

2              MR. McNEIL:  It is not?

3              THE COURT:  No.  That doesn't mean you can't show it

4    to him, but...

5    BY MR. McNEIL:

6    Q.  Do you know what this document is?

7              THE COURT:  I don't think he's located it.

8    BY THE WITNESS:

9    A.  This document was -- is a document of Polamer, Polamer

10   Company.  This document shows that my daughter purchased a

11   ticket from Polamer and that Mr. Bochenek paid for it.

12   BY MR. McNEIL:

13   Q.  What did it have to do with your employment by Master Hand

14   or Masterhaus or Purcon?

15   A.  Okay.  Well, I worked for Mr. Bochenek.  So since I did

16   not receive the payment, I asked him to pay this ticket using

17   my money that I earned and that he owed me.

18   Q.  So then it would be a credit then against the amount you

19   were owed by your employer?

20   A.  It's not a credit.  It's he owed me the money.  So it's a

21   certain payment, that form of payment to me.

22   Q.  Turn to page 400, please.

23             THE COURT:  Are you seeking to introduce that

24   exhibit?

25             MR. McNEIL:  I'm sorry?

1      THE WITNESS:  It was not 400.  It was $1,109.30.

2      THE COURT:  No, Mr. McNeil was asking you to turn to

3  trial document 0400.

4      THE WITNESS:  Could you please -- what kind of

5  document -- oh, I found it.  I found it.

6  BY MR. McNEIL:

7  Q.  Okay.  So I want to ask you about -- I'm going to ask you

8  about pages 400 through 403.  Can you tell me how much of this

9  document is in your handwriting?  Is it all in your

10  handwriting?

11  A.  I didn't find this document yet.

12      THE COURT:  All right.  Stop.

13      Mr. McNeil, you asked him for 0400.  Then you asked

14  him for 0400 to 403.

15      MR. McNEIL:  405.

16      THE COURT:  Now you're asking him to 405.  He's got

17  to find those documents.  He clearly has not found those

18  documents yet.

19      MR. McNEIL:  Okay.  Why don't we -- I'll withdraw the

20  question.

21      THE COURT:  All right.  The question is withdrawn.

22  We don't need those documents, okay.

23      MR. McNEIL:  Stop looking.

24  BY MR. McNEIL:

25  Q.  Turn to page 417, trial document number 417.  You have

Jaworski - cross

89

1    that one?

2         MS. COLUNGA-MERCHANT:  That's Plaintiff's Exhibit 3,

3    so he knows.

4         THE COURT:  This was the Master Hand Contractors

5    letter dated August 25, 2006, that we referred to earlier.

6         THE WITNESS:  Yes.

7         THE COURT:  Does he have that document?

8         THE WITNESS:  Yes.

9         THE COURT:  Okay.

10   BY MR. McNEIL:

11   Q.  It says that you were employed by Master Hand Contractors

12   as a mechanic/electronic specialist.  That's not true, is it?

13        INTERPRETER TRIPP:  One second.

14        The answer was "yes" before the remaining part of the

15   question happened.  So interpreter is going to correct it.

16   BY THE WITNESS:

17   A.  That's not true.

18   BY MR. McNEIL:

19   Q.  Are you saying it's not true that the mechanic/electronic

20   specialist was your position or your classification at Master

21   Hand?

22   A.  No.  My position was mechanic electronic.

23   Q.  As a mechanic, what did you do?  What did you actually...

24   A.  I did work in this position repairing or resetting the

25   construction machinery, various machinery like excavators or

Jaworski - cross

90

 1   bulldozers or cars or anything related.

 2   Q.   Turning to Plaintiff's Exhibit 6.

 3             THE COURT:  That is the summary chart.

 4             THE WITNESS:  Yes, I have it.

 5   BY MR. McNEIL:

 6   Q.   The column marked pay received, did you actually receive

 7   each of the payments that's listed in that column?

 8   A.   No.  The column which says pay received, that's what was

 9   calculated as is owed to me, but it -- no, it was not

10   received.

11   Q.   Was it just used in calculating the amount of payment

12   still to be paid?

13   A.   Yes.

14   Q.   The reason you weren't paid at the end of your employment

15   by Masterhaus is that it had no -- Master Hand -- Purcon is

16   because it had no money; is that right?

17             MR. WILLIAMS:  Your Honor, I'm going to --

18             THE COURT:  Hold on.  We have an objection.

19             MR. WILLIAMS:  On relevance grounds.

20             THE COURT:  I'll sustain the objection.

21             MR. McNEIL:  Nothing else, Your Honor.

22             THE COURT:  Anything further?

23             MS. COLUNGA-MERCHANT:  No, nothing further, Your

24   Honor.

25             THE COURT:  All right.  Thank you, Mr. Jaworski.

Bester - direct

1  That is the end of your testimony.  If we could have

2  Mr. Bester.

3           THE WITNESS:  Yes, thank you.

4           THE COURT:  All right.  Mr. Bester, could you please

5  stand and raise your right hand.

6           (Witness sworn.)

7       RYSZARD BESTER, PLAINTIFF'S WITNESS, DULY SWORN,

8                    DIRECT EXAMINATION

9  BY MS. COLUNGA-MERCHANT:

10  Q.  Can you please state your name for the record.

11  A.  Ryszard Bester.

12  Q.  Mr. Bester, do you know a person named Walter Bochenek?

13  A.  Yes, I do know him.

14       Good evening, Mr. Bochenek.

15  Q.  Okay.  And did you work for Mr. Bochenek from

16  approximately October 2003 to February 2009?

17  A.  Yes, I did.

18  Q.  Okay.  And did Mr. Bochenek hire you?

19  A.  Yes.

20  Q.  And did Mr. Bochenek hire you as an individual or as a

21  business?

22  A.  As an individual.

23  Q.  All right.  And did you understand that Mr. Bochenek was

24  the owner of Master Hand Contractors, Inc.?

25  A.  Yes.

Bester - direct

1   Q.  And did you also know that Mr. Bochenek was the owner of

2   Masterhaus Builders, Inc. and Purcon, Ltd.?

3   A.  Yes, I did know.

4   Q.  Okay.  And for the time period you worked for

5   Mr. Bochenek, did you sign a contract with either Master Hand,

6   Masterhaus or Purcon?

7   A.  No.

8   Q.  Okay.  And did you ever have to sign a contract for any

9   job that you worked on for each of the three companies?

10  A.  No.

11  Q.  Okay.  And for the period of time of October 2003 to

12  February 2009, did you receive payment for your work in checks

13  issued from Master Hand, Masterhaus and Purcon?

14  A.  Yes.

15  Q.  Okay.  And was there any difference in the work that you

16  performed for Mr. Bochenek that required you to be paid from

17  each of the three companies?

18  A.  No difference.

19  Q.  Okay.  And just so you know going forward, I am going to

20  refer to Master Hand, Masterhaus and Purcon as Master Hand.

21  Okay?

22  A.  Okay.

23  Q.  Okay.  And when did you stop working for Mr. Bochenek and

24  Master Hand?

25  A.  It seems October 2003 to the end of February 2009.

Bester - direct

93

1   Q.  Okay.  So you stopped working for Mr. Bochenek at the end
2   of February 2009?
3   A.  Yes.
4   Q.  Okay.  And did you work continuously for Mr. Bochenek and
5   Master Hand from October 2003 till the end of February 2009?
6   A.  Yes.
7   Q.  Okay.  And did you work for any other companies while you
8   worked for Master Hand?
9   A.  Yes.
10  Q.  Okay.  And what other companies did you work for?
11  A.  It was Polamer.
12  Q.  Okay.  And how did you start -- oh, sorry.
13  A.  Polamer and as well as consulate of Poland.
14  Q.  Okay.  And how did you start working for Polamer?
15  A.  I did it as per request of Mr. Bochenek.
16  Q.  Okay.  And how did you begin working for the Polish
17  consulate?
18  A.  Yeah.  That's the same.  Mr. Bochenek told me to work
19  there.
20  Q.  Okay.  And did Mr. Bochenek direct your work assignments
21  while you worked for Polamer?
22  A.  Yes.
23  Q.  And did Mr. Bochenek direct your work for the Polish
24  consulate?
25  A.  Yes.

Bester - direct

94

1    Q.  Okay.  And while you worked for Master Hand, could you

2    have worked for other companies without Mr. Bochenek's

3    authorization?

4    A.  No.

5    Q.  Okay.  And what was your job title when you worked for

6    Mr. Bochenek and Master Hand?

7    A.  As a plumber, plumber.

8    Q.  What type of plumbing work did you do for Master Hand?

9    A.  Interior, inside and outside, all kind of plumbing.

10   Q.  Okay.  And did Mr. Bochenek give you your job assignments?

11   A.  Yes.

12   Q.  Okay.  And would you be given these job assignments at the

13   beginning of each day?

14   A.  Yes.

15   Q.  And did Mr. Bochenek supervise your work at Master Hand?

16   A.  Yes.

17   Q.  Did anyone else supervise your work at Master Hand?

18   A.  Yes.

19   Q.  And who else supervised your work?

20   A.  Mr. Kieslawicz.  He was like a foreman.  And

21   Mr. Karpinski.  And of course Mr. Bochenek.

22   Q.  Okay.  And did Mr. Bochenek, the foreman and

23   Mr. Karpinski, did they give you instructions or directions on

24   how to complete your job assignments?

25   A.  Mr. Bochenek instructed me.

Bester - direct

95

1   Q.  And how did Mr. Bochenek instruct you?

2   A.  He would do this in person during the conversation in

3   person or over the phone.

4   Q.  And what types of directions or instructions would he give

5   you?

6   A.  Okay.  So he would tell me what kind of materials I could

7   use during the installation depending on the city because

8   different cities or different places had different codes to

9   obey.

10  Q.  Okay.  So then Mr. Bochenek would decide which materials

11  you would use to complete your job assignments, correct?

12  A.  Yes.

13  Q.  Could you decide which materials could be used to complete

14  a job assignment?

15  A.  No.

16  Q.  Okay.  And did this go for tools as well?  So did

17  Mr. Bochenek decide which tools would be used to complete your

18  job assignment?

19  A.  Yes.

20  Q.  Okay.  Did you purchase any tools or materials to complete

21  your job assignments?

22  A.  Only as per direction from Mr. Bochenek.

23  Q.  Okay.  So you couldn't decide to purchase without his

24  authorization any materials or tools in order to complete that

25  job?

Bester - direct

96

1   A.  Yes.

2   Q.  Okay.  And when you did have to purchase those materials

3   or tools, would you be reimbursed for those purchases?

4   A.  No.

5   Q.  So you would pay for these materials and tools out of your

6   own pocket?

7   A.  If I would purchase without the authorization, then yes,

8   it would be coming from my own pocket.

9   Q.  Okay.  So when you did obtain authorization from

10  Mr. Bochenek, would you be reimbursed for those purchases?

11  A.  Yes.

12  Q.  Okay.  And did you use your own tools to perform your job

13  duties?

14  A.  No.

15  Q.  And did you have your own employees?

16  A.  No.

17  Q.  And did you have the authority to hire your own employees?

18  A.  No.

19  Q.  Okay.  And what was your typical work schedule?

20  A.  From 7:00 in the morning till 5:00 in the afternoon.

21  Q.  And was this Monday through Friday?

22  A.  Yes.

23  Q.  Did you ever work any Saturdays?

24  A.  If I wanted for Saturdays and one Sunday.

25  Q.  Okay.  And typically what hours would you work on a

1    Saturday?

2    A.  I -- from 7:00 to 1:00, if I remember correct.

3    Q.  Okay.  And did Mr. Bochenek give you this schedule?

4    A.  Yes.

5    Q.  And did he give you this schedule at the time you were

6    hired?

7    A.  Yes.

8    Q.  And did your schedule ever change?

9    A.  Yes.

10   Q.  And when would that schedule change?

11   A.  Okay.  Yeah, it did change in a situation when we had a

12   rush job.  The service was started or something unexpected

13   happened, it had to be taken care of right away, I would call

14   Mr. Bochenek and then he would extend my hours.

15   Q.  Okay.  And so who would inform you of the change in your

16   schedule?

17   A.  Mr. Bochenek.

18   Q.  Okay.  And would Mr. Bochenek inform you of the schedule

19   change ahead of time or the same day?

20   A.  Yeah, it varied.  The very same day or toward the end of

21   the day ahead of the next day.

22   Q.  Okay.  Could you have decided to come into work later than

23   your scheduled start time?

24   A.  It was not an option.

25   Q.  Okay.  And could you have left earlier than your scheduled

1    end time?

2              INTERPRETER TRIPP:  I'm sorry?

3    BY MS. COLUNGA-MERCHANT:

4    Q.  Sure.  So could you leave earlier than your scheduled end

5    time?

6    A.  Only with permission of Mr. Bochenek.

7    Q.  Okay.  And so without Mr. Bochenek's permission you

8    couldn't change your schedule; is that right?

9    A.  No, I could not.

10   Q.  Okay.  So you testified earlier that your typical schedule

11   is Monday through Friday from 7:00 a.m. to 5:00 p.m., correct?

12   A.  Yes.

13   Q.  Okay.  So approximately how many hours would you work in a

14   typical work week?

15   A.  50 and over, but I can't say exactly.

16   Q.  Okay.  But approximately 50 -- at least 50 hours per week?

17   A.  Yeah, you could say so.

18   Q.  Okay.  Were you paid by check?

19   A.  Yes.

20   Q.  Okay.  And were you paid at an hourly rate or on a per-job

21   basis?

22   A.  Both.  Both.  Usually it was hourly rate.  However, both

23   the hourly rate and as per assignment or job.

24   Q.  And can you describe the work -- or I guess the

25   assignments that would require the differences in how you were

Bester - direct

99

1   paid?

2   A.   Okay.  If -- let's say it was a big plumbing project and I

3   worked fast and very efficiently, then Mr. Bochenek would pay

4   me, like, a bonus for my work.

5   Q.   Okay.  And what type of jobs would -- or assignments would

6   require you to be paid at an hourly rate?

7   A.   Small plumbing jobs and plus a variety of other jobs.

8   Q.   Okay.  And did Mr. Bochenek decide on -- decide how you

9   were to be compensated through this per job and through this

10  hourly rate?

11  A.   Yeah, this was Mr. Bochenek proposed it, and he paid me

12  well.

13  Q.   Okay.  And what was your hourly rate of pay?

14  A.   $15 per hour.

15  Q.   Okay.  And Mr. Bochenek determined your hourly rate,

16  correct?

17  A.   Okay.  So when -- upon hiring me, I -- at the time, I had

18  10.  Then I had 12.  Then I had 15.

19  Q.   Okay.  So for the time period from November of 2006 to

20  February 2009, was your hourly rate of pay $15 per hour?

21  A.   Then you have to deduct one year because before it was 10

22  and 12 and then after that was 15.

23  Q.   Okay.  So -- right.  Because he -- because you started

24  working October of 2003, correct?

25  A.   Yes.

Bester - direct

1  Q.  Okay.  So from 2003 until when were you making $10 an

2  hour?

3  A.  So I got the raise by the end of 2004.

4  Q.  Okay.  So then from 2004 until about when did -- were you

5  paid $12 an hour?

6          INTERPRETER TRIPP:  12?

7          MS. COLUNGA-MERCHANT:  12 because he said he got a

8  raise to $12 an hour.

9  BY THE WITNESS:

10  A.  Okay.  So the change took place within the first year.

11  For the first six months or half of the first year, I was paid

12  10 per hour.  For the second half of the first year, I was

13  paid 12, and after that, 15.

14  BY MS. COLUNGA-MERCHANT:

15  Q.  Okay.  So then for the time period of this lawsuit, which

16  is October of -- November of 2006 through the end of February

17  2009, you were earning $15 per hour, correct?

18  A.  Yes, yes.  Yes.

19  Q.  Okay.  So did you receive payments from Masterhaus and

20  Purcon in addition to Master Hand?

21  A.  Yeah, I was receiving this check, so I think so.

22  Q.  Okay.  And did you have to submit any additional tax

23  paperwork to Masterhaus and Purcon in order to receive those

24  payments?

25  A.  I am not sure I understand your question.

Bester - direct

101

1   Q.  Sure.  So at the time of hire, did you submit to

2   Mr. Bochenek and Master Hand any tax information?

3   A.  No, I didn't have -- I didn't have to submit such

4   information because I paid taxes on my own.

5   Q.  Okay.  Did -- okay.  So did you ever have to submit a W-9

6   form to Mr. Bochenek and Master Hand listing your Social

7   Security number?

8           INTERPRETER TRIPP:  Could you repeat the name of

9   the --

10          INTERPRETER KUZNIAR:  IRS, Internal Revenue Service.

11          THE WITNESS (In English):  IRS.

12  BY THE WITNESS:

13  A.  So at the very beginning I did not have the Social

14  Security number.  So I just gave him the form, the IRS form.

15  BY MS. COLUNGA-MERCHANT:

16  Q.  So after you gave him that form, in order to get payments

17  from Masterhaus and Purcon, did you have to submit that form

18  to him again?

19  A.  No.

20  Q.  Okay.  And who would give you your payments?

21  A.  Mr. Bochenek, Ms. Agnieszka, and at work it was probably

22  Mr. Karpinski.

23  Q.  Okay.  And during the time you worked for Master Hand, did

24  anyone keep track of the hours you worked?

25  A.  Myself and Mr. Karpinski.

Bester - direct

1   Q.  Okay.  And how did you keep track of the hours you worked?

2   A.  I would write down between seven and ten in my copy book.

3   Q.  Okay.  And how did Mr. --

4   A.  Or notebook.

5   Q.  And how did Mr. Karpinski keep track of the hours you

6   worked?

7   A.  Okay.  Mr. Karpinski, he kept record for everybody using

8   the worksheets or time sheets.

9   Q.  Okay.  And did you submit your -- did you submit how you

10   kept track of your hours to anyone at Master Hand?

11   A.  To Mr. Bochenek or Ms. Agnieszka.

12   Q.  Okay.  And is this how you received payments for your

13   hours worked from Master Hand?

14   A.  Yes.  Yes.

15        MS. COLUNGA-MERCHANT:  Okay.  So I am marking

16   Plaintiff's Exhibit 7 for identification.

17        And may the record reflect I'm showing opposing

18   counsel Plaintiff's Exhibit 7.

19   BY MS. COLUNGA-MERCHANT:

20   Q.  And, Mr. Bester, Plaintiff's Exhibit 7 begins with trial

21   document number 350 through 374.  And these appear to be

22   handwritten documents listing the job sites and amounts of

23   your work.

24   A.  Yes.

25   Q.  Do you have it in front of you?

Bester - direct

1    A.  Yes, I do.

2    Q.  Okay.  Do you recognize this exhibit?

3    A.  Yes, I do.

4    Q.  Okay.  And have you ever seen these documents prior to the

5    start of the litigation?

6    A.  Yes.

7    Q.  Okay.  Can you tell me what these documents are?

8    A.  This is the record, biweekly record of the -- of the time

9    cards.

10   Q.  Okay.  And are these the same documents you submitted to

11   Master Hand to receive payments for your hours worked?

12   A.  Yes.

13   Q.  Okay.  And is Plaintiff's Exhibit --

14            THE COURT:  Counsel.  Counsel.

15            MS. COLUNGA-MERCHANT:  Yes.

16            THE COURT:  Let me...

17            Mr. Bester, is Plaintiff's Exhibit 7 the notes that

18   you kept of your time?

19            THE WITNESS:  What notes are we talking about?

20   Because that stripe or the letter S, they were added.  These

21   notes were added.

22            THE COURT:  You said that you kept track of your

23   hours in a notebook.  Is this the pages from the notebook?

24            THE WITNESS:  But in these pages they are here, the

25   hours.

1          THE COURT:  Go ahead, Counsel.

2          THE WITNESS:  So I don't have anything against

3   Mr. Bochenek because normally he would pay me hourly rate, but

4   for some other jobs he would pay me better.  He pay me well,

5   and he wanted me to write each, depending on the type of the

6   job, write it down in a way depending on the type of job.

7          THE COURT:  All right.  You can continue, Counsel.

8   BY MS. COLUNGA-MERCHANT:

9   Q.  Okay.  So just to clarify, Mr. Bester, are these notes in

10  this exhibit, is this written in your handwriting?

11  A.  Handwriting, yes.

12  Q.  Okay.  And so is Plaintiff's Exhibit 7 an accurate

13  representation of the documents you originally submitted to

14  Master Hand?

15  A.  One moment.  Could you repeat the number of the document?

16  Q.  Sure.  No.  I was just asking for the whole exhibit, so

17  the entire packet.  So from 350 through 374, are those

18  documents accurate representations?

19  A.  Okay.  I'm checking because I'm not sure for what period

20  of time it is.  Okay.  The documents are -- yes, they are my

21  documents, yet Mr. Bochenek crossed certain things and did

22  some corrections.

23  Q.  Okay.  So we'll go over one example of that.  So could you

24  please turn to trial document number 374.  That's the last

25  page of the exhibit.  Okay.  It has the dates November 19,

Bester - direct

1    2007 to November 30, 2007.

2    A.   2007?  One moment.

3    Q.   Okay.

4    A.   This is 2008.  This one is 2009.

5    Q.   Okay.  The number on the bottom is 374.

6    A.   Yeah, I understand, but it doesn't look like I have it.

7    That's why I'm checking.  I don't have this document.  You

8    said 374, correct?

9    Q.   Yes, that's correct.

10   A.   Okay.  I have it.

11   Q.   You have it.  Okay.  Excellent.  So under II, No. 4, you

12   wrote down Thanksgiving Day, correct?

13   A.   Yes.

14   Q.   Okay.  And did Mr. Bochenek pay you for holidays?

15   A.   Yes.

16   Q.   Okay.  And you originally charged 150 for Thanksgiving

17   Day, correct?

18   A.   Yeah, but Mr. Bochenek crossed it, and he wrote down 120.

19   Q.   Okay.  So how did you calculate the amount of $150?

20   A.   Well, for the hours times 15.

21   Q.   So that was ten hours times your hourly rate of $15,

22   correct?

23   A.   Yeah, that's -- Bochenek told me that's how I should write

24   it down.

25   Q.   Okay.  And so do you know how he calculated 120?

Bester - direct

106

1    A.  I don't know.

2    Q.  Okay.

3            MS. COLUNGA-MERCHANT:  So, Your Honor, at this time

4    we would like to introduce Plaintiff's Exhibit 7 into

5    evidence.

6            THE COURT:  Any objection?

7            MR. McNEIL:  One second.

8            THE COURT:  Mr. McNeil, any objection?

9            MR. McNEIL:  I just want to make sure we have the

10   right numbers.  350?

11           THE COURT:  I'm sorry.  I can't hear you.

12           MR. McNEIL:  Is this trial document 350?

13           MR. WILLIAMS:  Yes, 350 to 374.

14           MR. McNEIL:  No objection.

15           THE COURT:  All right.  It will be admitted.

16     (Plaintiff's Exhibit No. 7 was received in evidence.)

17   BY MS. COLUNGA-MERCHANT:

18   Q.  Okay.  Mr. Bester, during the time you worked at Master

19   Hand, did anyone keep track of the payments you received --

20   I'm sorry.

21   A.  What page I should be looking at?

22   Q.  We're not looking at any pages right now.  These are just

23   different questions.

24           Okay.  So during the time you worked for Master Hand,

25   did Mr. Bochenek keep track of the payments he gave you?

Bester - direct

1    A.  I don't know that.

2    Q.  Okay.  Were you paid for all the hours you worked for

3    Master Hand?

4    A.  If I would have it paid, I wouldn't be a loser.

5    Q.  Okay.  So you --

6    A.  No, I was not.

7    Q.  Okay.  And to the best of your recollection, how many

8    hours of work were unpaid?

9    A.  It's hard for me to count it.

10   Q.  Okay.  Do you remember approximately the amount that you

11   are owed in unpaid wages?

12   A.  Yeah, this I remember.

13   Q.  Okay.  So what is the amount of wages that you are owed?

14   A.  I'm going to tell you in a moment.  Over $21,000.

15   Q.  Okay.  And did you complain to Mr. Bochenek about these

16   unpaid wages?

17   A.  Yes.

18   Q.  And when did you complain to him about these unpaid wages?

19   A.  Every two weeks.

20   Q.  Okay.  And what would be --

21           INTERPRETER KUZNIAR:  Every two weeks.

22           INTERPRETER TRIPP:  Yes, every two weeks.

23   BY MS. COLUNGA-MERCHANT:

24   Q.  So what would be Mr. Bochenek's response to your

25   complaints?

Bester - direct

1    A.  That he will make it up in those amounts.

2    Q.  Okay.  And did you continue to work for Mr. Bochenek and

3    Master Hand despite not being paid for all of your hours

4    worked?

5    A.  Yes.

6          MS. COLUNGA-MERCHANT:  Okay.  I'm marking Plaintiff's

7    Exhibit No. 8.

8          And may the record reflect that I'm showing opposing

9    counsel Plaintiff's Exhibit No. 8.

10   BY MS. COLUNGA-MERCHANT:

11   Q.  Mr. Bester, Plaintiff's Exhibit 8 is trial document number

12   454 through 455.  And that is the summary worksheet with the

13   amounts that we calculated you're owed.

14         Okay.  Mr. Bester, have you seen this document

15   before?

16   A.  No, I haven't.

17   Q.  Okay.  Did you help prepare this document?

18   A.  No.

19   Q.  Okay.

20   A.  No.  Yes.  No.  Yes.  Yes.  Yes.

21   Q.  Yes.

22         INTERPRETER KUZNIAR:  Yes, I saw it before, and I did

23   have to prepare it.

24   BY MS. COLUNGA-MERCHANT:

25   Q.  Okay.  So earlier you testified that you worked

Bester - direct

1   continuously from October 2003 through February 2009, correct?

2   A.  No, many years.

3   Q.  The question -- the question is that you worked

4   continuously from October 2003 through February 2009 for

5   Master Hand, correct?

6   A.  Yes.

7   Q.  And you testified that you were paid at an hour --

8          THE COURT:  Counsel, let's not repeat his prior

9   testimony.

10         MS. COLUNGA-MERCHANT:  Okay.

11         THE COURT:  Ask him a direct question.

12         MS. COLUNGA-MERCHANT:  Okay.

13  BY MS. COLUNGA-MERCHANT:

14  Q.  Were you paid at $15 an hour for small plumbing jobs and

15  non plumbing jobs?

16  A.  Yes.

17  Q.  And if you look at trial -- the Plaintiff's Exhibit No. 8,

18  the pay received column, which is the fourth column from the

19  left.  Okay.  Is that the pay that you would typically receive

20  for the hourly -- at your hourly rate for hours worked?

21  A.  It's hard to say.  It's hard to say.  Yes.

22  Q.  Okay.  And throughout your employment with Master Hand,

23  did you receive overtime pay?

24  A.  No.

25  Q.  Okay.  So does this exhibit truly and accurately show the

Bester - direct/cross

110

1   hours you worked, your hourly rate of pay and the pay you did

2   not receive for the time period you worked for Mr. Bochenek

3   and Master Hand, to the best of your recollection?

4   A.  Yes.

5           MS. COLUNGA-MERCHANT:  Okay.  Your Honor, at this

6   time, I would like to move this exhibit into evidence.

7           THE COURT:  Any objection?

8           MR. McNEIL:  No objection.  No objection.

9           THE COURT:  It will be admitted.

10    (Plaintiff's Exhibit No. 8 was received in evidence.)

11          MS. COLUNGA-MERCHANT:  And that's all we have.

12          THE COURT:  All right.  Cross-examination.

13                      CROSS-EXAMINATION

14  BY MR. McNEIL:

15  Q.  Good afternoon, Mr. Bester.

16  A.  Hello.

17  Q.  Please turn to trial document number 350 and have in front

18  of you from document 350 through 374.

19          THE COURT:  Those are the handwritten notes.

20  BY MR. McNEIL:

21  Q.  Let me know when you have those in front of you.

22  A.  So it's 354 and --

23          THE COURT:  350 to 374.

24          INTERPRETER TRIPP:  Is it okay for me to speak to

25  him?

Bester - cross

1      We're sure it's here because you used it before.  The

2 interpreter is speaking.

3      INTERPRETER KUZNIAR:  Could you please give the date

4 of the document because he will find it in his notes.

5      THE COURT:  Off the record.

6   (Off the record.)

7      THE COURT:  Back on the record.

8 BY MR. McNEIL:

9 Q.  15 pages, Mr. Bester.  At the top right of the first

10 page --

11      MR. WILLIAMS:  Judge could we have the interpreter

12 take control of the documents?  Do you mind if I --

13      THE COURT:  I don't care what you do as long as we

14 can find the document.

15      MR. WILLIAMS:  Ms. Interpreter --

16      THE COURT:  Off the record.

17   (Off the record.)

18      THE COURT:  All right.  Mr. Williams, you can help

19 your witness find the documents.  If they don't find the

20 documents, that's going to preclude cross-examination, and I'm

21 going to strike the witness's testimony.  This is exactly the

22 situation that I did not want to occur.

23      MR. WILLIAMS:  Understood.

24      THE COURT:  You can notify me in chambers when the

25 document has been located.

Bester - cross

112

```
 1      (Off the record.)

 2             THE COURT:  You may attempt to begin, Mr. McNeil.

 3   BY MR. McNEIL:

 4   Q.  Mr. Bester, do you have in front of you trial document 450

 5   through 474?

 6             MS. COLUNGA-MERCHANT:  350, not 450.

 7             MR. McNEIL:  Yes, 450.

 8             THE COURT:  350.

 9   BY MR. McNEIL:

10   Q.  Trial document numbers 350 through 374?

11   A.  Yes, they are still printing.  They need to print the last

12   page.

13   Q.  Well, we can start on the document.

14             Mr. Bester, there's a list of seven items on the

15   first page of this exhibit.  To what do those items refer?

16             INTERPRETER TRIPP:  I couldn't hear the question.

17   Could you repeat?

18   BY MR. McNEIL:

19   Q.  To what do those items refer?

20   A.  So this is the price or what would be paid for certain

21   plumbing jobs.

22   Q.  Plumbing jobs did you say?

23   A.  Yes, plumbing.

24   Q.  At the top tell me what the first line says.

25   A.  Okay.
```

Bester - cross

1          INTERPRETER TRIPP:  Interpreter is speaking.  The

2  first he said cold water, copper, warm water, copper, 250 and

3  then sewer PVC pipes.

4  BY MR. McNEIL:

5  Q.  The dollar amounts that are on the right-hand side, is

6  that the amount you offered to do the entire job for?  By the

7  whole job, I mean the part that's in brackets in front of the

8  $250.

9  A.  Yes.

10  Q.  What does the $250 stand for?

11          INTERPRETER TRIPP:  One second.

12  BY THE WITNESS:

13  A.  This is, for example, for a riser.  So let's say if I do

14  the copper pipe and I have the cold water or warm water and I

15  need to go up as a riser or I go across or horizontally, then

16  this is 250.  Each one, each one is 250.

17  BY MR. McNEIL:

18  Q.  With whom are you negotiating when you made out this list

19  of proposals?

20  A.  This proposal, it was Mr. Bochenek's proposal.

21          MR. McNEIL:  I'm sorry.  I didn't catch the last four

22  words there.

23          INTERPRETER TRIPP:  It was Mr. Bochenek's proposal.

24  BY MR. McNEIL:

25  Q.  How about No. 2, is that for Mr. Bochenek also?

Bester - cross

1    A.   Yes.

2    Q.   And 3 through 7?

3    A.   Yes.

4    Q.   And these were flat amounts?  You offered to do the work

5    for one lump sum payment?

6    A.   Yes.  Yes.

7    Q.   Turn to page -- trial document number 351.  It's the next

8    page.

9    A.   Yes.

10   Q.   To what type of job does this document refer?

11   A.   Okay.  This type of job were known as plumber jobs.

12           INTERPRETER TRIPP:  One second.

13   BY THE WITNESS:

14   A.   And they were done for the construction site of the

15   school.

16           INTERPRETER TRIPP:  Go ahead.

17   BY MR. McNEIL:

18   Q.   Do any of the items on the first page refer to the school?

19   A.   Yes.  Yes, it's also related to the school.

20   Q.   Okay.  On page 3, which is 352, is everything on that

21   related to the school also?

22   A.   Over here there's no school whatsoever at all.  And those

23   jobs -- these jobs, they do correlate to school, but they are

24   non plumbing jobs.  And the other are -- marked are the 222,

25   which is Pioneer.

Bester - cross

1    Q.   The circled amounts on each of the pages, is there any

2    meaning to the circling of the amount?  Actually it looks like

3    they're all circled.  Does the circle mean --

4    A.   No, it's just to sort of, like, highlight or visual

5    effect.  That's how it was agreed.

6    Q.   Each of the jobs here was to be completed by you for a

7    fixed price; is that correct?

8    A.   Yes.

9    Q.   There was no hourly rate that you would be paid, right?

10   A.   Yes, it was.  On this page, 352, yes, it was.

11        MR. McNEIL:  I'm sorry.  Could you re-read that back,

12   please.

13     (Record read.)

14   BY MR. McNEIL:

15   Q.   So you never discussed with Mr. Bochenek an hourly rate to

16   pay; is that correct?

17   A.   Okay.  With Mr. Bochenek, I had two types of arrangement.

18   One it was rate, hourly.  The second, it was payment per job

19   that was agreed ahead of time.  And then anything related to

20   plumbing jobs they were also paid hourly.

21   Q.   So there were weeks when you had both work at an hourly

22   rate and work at a fixed sum?

23   A.   Some of them they were paid as per hourly rate, and some

24   of them they were paid -- they were paid at the same points,

25   which is per job.  Just over here you can see three different

Bester - cross

1    addresses.

2    Q.  Look at Plaintiff's Exhibit 8, please.  Put that in front

3    of you, Plaintiff's 8, trial document number 454.  It's the

4    summary exhibit of plaintiff Bester.

5    A.  Okay.  Yes.  Yes, I can see that.

6    Q.  And the rate of pay, it says $15 per hour, right?

7    A.  Yes.

8    Q.  But on many projects you weren't paid $15 an hour, were

9    you?  Correct?

10   A.  Yes, they were -- they were like this, yes.

11   Q.  And the column that's marked pay received, that's not

12   true.  Those amounts were not received by you, were they?

13          INTERPRETER KUZNIAR:  No, it was not paid.

14   BY THE WITNESS:

15   A.  It was not paid.

16   BY MR. McNEIL:

17   Q.  Is there any place in this document where it is accurate?

18   A.  So it's the page 455.

19          INTERPRETER KUZNIAR:  The wages owed.

20          THE WITNESS (In English):  The wages owed, okay.

21          MR. McNEIL:  Two witnesses down there, Your Honor?

22          THE COURT:  Apparently.  Hold on.  Hold on, please.

23          I appreciate the interpreter in Poland's efforts, but

24   we have to have Mr. Bester speak only.

25          Please ask the question again.

Bester - cross

1          MR. McNEIL:  Could you read back the -- that's all
2   right.

3          THE COURT:  Please stop.  Please stop.  I have to
4   make this as clear as possible.  There should only be two
5   people -- three people speaking:  Mr. Bester, Mr. McNeil, the
6   attorney in the U.S., and the interpreter here in the U.S.

7          Please proceed.

8          MR. McNEIL:  Appreciate that, Your Honor.

9   BY MR. McNEIL:

10  Q.  So there's, in fact, nothing on this entire sheet that's
11  accurate, is there?

12  A.  There is something there which is correct.

13  Q.  There is something there which is correct.  What's there
14  that is correct?  The spelling?

15  A.  The sheet number 455.

16         THE COURT:  Ms. Tripp.

17         THE WITNESS:  Okay.  There are sections which say
18  that last day when he worked, it was in February 2009; and
19  there's a section February 27, 2009, and there's a section
20  which is correct which says wages owed, $21,170.50.

21         MR. McNEIL:  Nothing else, Your Honor.

22         THE COURT:  All right.  Thank you.  There's no
23  question pending.

24         Do you have any further questions, Counsel?

25         MS. COLUNGA-MERCHANT:  No, Your Honor.

1          THE COURT:  Thank you, Mr. Bester.  We are finished.

2          All right.  Is there any other need for folks?

3          All right.  Thank you, both.  We're going to

4   terminate the call and the video at this time.

5          Mr. Bester, your counsel will be in touch with you in

6   the future.

7          THE WITNESS:  Okay.

8          THE COURT:  Thank you very much.

9          All right.  Mr. Williams, is Mr. Moskal still

10  present?

11         MR. WILLIAMS:  No, we don't have any further

12  questions for Mr. Moskal.

13         THE COURT:  Okay.

14         MR. WILLIAMS:  There is another witness that we

15  subpoenaed who is the secretary mentioned earlier, the

16  bookkeeper, Agnes Kedzierski, who is here and available to

17  testify now.  She asked if possible to go today.

18         THE COURT:  Let's go.

19         Ma'am, could you please step up to the witness stand.

20         (Witness sworn.)

21     AGNES KEDZIERSKI, PLAINTIFF'S WITNESS, DULY SWORN,

22                   DIRECT EXAMINATION

23  BY MR. WILLIAMS:

24  Q.  Good afternoon, and thank you for your patience.

25  A.  No problem.

Kedzierski - direct

1    Q.  Can you state and spell your name for the record?

2    A.  Agnes Kedzierski, K-e-d-z-i-e-r-s-k-i.

3    Q.  Could you pronounce it for me?

4    A.  Kedzierski.

5    Q.  Kedzierski?

6    A.  Yes.

7    Q.  Thank you.  And do you know a person named Walter

8    Bochenek?

9    A.  Yes.

10   Q.  And who is he?

11   A.  I used to work for him.

12   Q.  I'm sorry.  And what was the job --

13          THE COURT:  Hold on, please.

14          MR. WILLIAMS:  Oh.

15     (Off the record.)

16   BY MR. WILLIAMS:

17   Q.  Okay.  I apologize.  And can you tell me what your job

18   duties were with Mr. Bochenek?

19   A.  Sure.  I was secretary, and I was also keeping

20   bookkeeping, something like that.

21   Q.  Did you handle entries into QuickBooks?

22   A.  Yes.

23   Q.  And did you have authority --

24          MR. McNEIL:  Your Honor, I hate to interrupt, but we

25   can't hear over here.

Kedzierski - direct

120

 1          THE COURT:  All right.  I'm sorry, ma'am.  We're

 2    going to have to take a break.

 3          Get the audio people in here and turn that off so we

 4    can have some sound, please.  We'll take a ten-minute break.

 5      (Recess.)

 6          THE COURT:  All right.  I think we have sound.  We

 7    have no camera.  We have everybody we need?

 8          MR. WILLIAMS:  We do.

 9          THE COURT:  All right.  Let's move forward.

10          MR. WILLIAMS:  Thank you, Your Honor.

11    BY MR. WILLIAMS:

12    Q.  Ms. Kedzierski, could you explain your job duties while

13    you worked with Mr. Bochenek?

14    A.  Well, like I said, I was the secretary, so picking up all

15    the phone calls, talking to subs, clients, whatever needed to

16    be done.

17          THE COURT:  All right.  Ms. Kedzierski, I'm going to

18    ask you to move that a little closer or sit a little closer.

19          THE WITNESS:  Sure.

20          THE COURT:  Okay.  Thank you.

21    BY MR. WILLIAMS:

22    Q.  You mentioned you also were a bookkeeper?

23    A.  Yes.

24    Q.  And what did you do as a bookkeeper?

25    A.  I was sending out the invoices.  I was doing the entries

Kedzierski - direct

121

1    in QuickBooks.

2    Q.   Okay.  And did you work for Master Hand Contractors?

3    A.   Yes.

4    Q.   Yes?

5    A.   Yes.

6    Q.   And did you also work for Masterhaus Builders, Inc.?

7    A.   Well, I don't know how to answer that because I was

8    getting checks from Master Hand.

9    Q.   Your paycheck came from Master Hand?

10   A.   Yes, my check.

11   Q.   Did you process any invoices for Masterhaus?

12   A.   Yes.

13   Q.   So you were doing -- you were performing work for

14   Masterhaus; is that fair?

15   A.   Correct.

16   Q.   And how about Purcon Ltd.?

17   A.   No.

18   Q.   You never handled anything to do with Purcon Ltd.?

19   A.   Not the invoices, no.

20   Q.   How about payments to workers?

21   A.   Yes.

22   Q.   Did you process those?

23   A.   I was writing the checks, yes.

24   Q.   Okay.

25   A.   Sometimes.

Kedzierski - direct

1   Q.   What was your understanding of the difference between

2   those three companies?

3   A.   Well, Master Hand is the -- or was the general contractor.

4   Masterhaus was doing demolition, excavation and work services.

5   And Purcon was basically I would say like on the beginning the

6   dealer of hardware.

7   Q.   Did any workers get paid by Purcon?

8   A.   They did.

9   Q.   Okay.  Were the three companies located at the same

10  address?

11  A.   Yes.

12  Q.   And what was that address?

13  A.   3401 West Chicago.

14  Q.   And the same office at that address?

15  A.   Yes.

16  Q.   Okay.  And is it your understanding Mr. Bochenek is the

17  owner of all three?

18  A.   Yes.

19  Q.   Did you work in this capacity for Mr. Bochenek between

20  2006 and 2009?

21  A.   No.  I was actually working from either '98 or '99 till I

22  would say, like, May or June of 2005.  And then I was only

23  working, like, from time to time.

24  Q.   And what were you doing from time to time when you worked

25  for Mr. Bochenek?

1  A.  Basically sworn statements.  But I was never like a -- I

2  was basically in and out.  So whenever I could come I would

3  come.  That was about it.

4  Q.  Did you still manage the books?

5  A.  No.

6  Q.  Did you prepare any paychecks or anything?

7  A.  Paychecks, maybe from time to time.  But the books, no, it

8  was somebody else was taking care of it.

9  Q.  Who was that?

10  A.  Well, when we were in Chicago on the Chicago Avenue, it

11  was me.  And then when they moved out to Elgin, I think it was

12  either her name was Justyna or Aleksandra.  Justyna, I know

13  that she started with Master Hand while I was there in

14  Chicago, so probably 2005.

15  Q.  When you were working in the period of 2006 to 2009 --

16  A.  No, it was -- you mean like part-time?

17  Q.  I'm sorry.  Yes.

18  A.  Like from time to time?

19  Q.  Right.  When you were working -- when you were performing

20  work from time to time.

21  A.  Mm-hmm.

22  Q.  Did you ever handle time cards?

23  A.  No.  Mostly it was sworn statements, like preparing the

24  sworn statements, preparing invoices and waivers, going to

25  title companies, but like I said, it was very minimum.

Kedzierski - direct

124

1   Q.  Okay.  And you're saying sworn statements?

2   A.  Yes.

3            MR. WILLIAMS:  Your Honor, could I take a second?

4            THE COURT:  Sure.

5      (Counsel conferring.)

6            MR. WILLIAMS:  Judge, I have no further questions for

7   the witness.

8            THE COURT:  All right.

9            Any cross-examination?

10           MR. McNEIL:  No, Your Honor.

11           THE COURT:  All right.  Thank you, ma'am.  You're

12   excused.

13           THE WITNESS:  Okay.

14           THE COURT:  Plaintiff can call your next witness.

15           MR. WILLIAMS:  Judge, they never identified the

16   people that this witness just testified to that worked after

17   her in 2006, which is the relevant time period for this case.

18   The only person they identified as doing the books was

19   Ms. Kedzierski.  So I'm a little shocked that we're just

20   finding out now that she -- that they didn't identify the

21   person who handled the books.

22           THE COURT:  Was Ms. Kedzierski deposed?

23           MR. WILLIAMS:  She was not.  Mr. Bochenek was, and he

24   testified she was the one who did the books.

25           THE COURT:  All right.  Well, that will have to be

                          Bochenek - direct
                                                                      125

 1   addressed in due course.

 2              MR. WILLIAMS:  Okay.

 3              THE COURT:  Any further witnesses?

 4              MR. WILLIAMS:  We don't have any further witnesses

 5   then.

 6              THE COURT:  All right.

 7              Mr. McNeil, are you prepared to go forward?

 8              MR. McNEIL:  I think we can, yeah.  Okay.  I may need

 9   two minutes, but I imagine we could get going.

10              THE COURT:  All right.  Let's go.

11              MR. McNEIL:  Appreciate it.

12      (Counsel conferring.)

13              MR. McNEIL:  I'm calling Walter Bochenek.

14              THE COURT:  All right.

15      (Witness sworn.)

16         WALTER F. BOCHENEK, DEFENDANT'S WITNESS, DULY SWORN,

17                        DIRECT EXAMINATION

18   BY MR. McNEIL:

19   Q.  State your name and spell your last name for the record.

20   A.  Walter F. Bochenek, B-o-c-h-e-n-e-k.

21   Q.  And you're one of the defendants in this matter?

22   A.  Pardon me?

23   Q.  You're one of the defendants?

24   A.  Yes.

25   Q.  Where are you currently employed, if anywhere?

Bochenek - direct

126

1   A.  You have to go slower.

2   Q.  Go ahead.

3           THE COURT:  He didn't understand you.

4           THE WITNESS:  I didn't understand.

5   BY MR. McNEIL:

6   Q.  Where are you currently employed, if anywhere?

7   A.  Currently, still at Master Hand, or leftover of Master

8   Hand.

9   Q.  Okay.  And how long have you owned or been involved in the

10  Masterhaus business?

11  A.  Masterhaus I think was started in 1992, if I have right

12  recollection.

13  Q.  How about Master Hand?

14  A.  Master Hand was in 1987 and incorporated in 1988.

15  Q.  How about Purcon?

16  A.  Purcon was 1994.

17  Q.  Any other entities that you owned, businesses?

18  A.  Well, I have different companies or partial interest in

19  different companies but was not involved with that.

20  Q.  Okay.  Are you familiar with a project at the Sacred Heart

21  School?

22  A.  Yes, I am.

23  Q.  Tell me in general what that project was all about.  First

24  of all, who contracted with you to do the job?

25  A.  I was contracted basically by Antonovich Associates to

Bochenek - direct

1    do --

2    Q.   A-n-t-o-n-o-v-i-c-h?

3    A.   And which we worked before on restoration project on

4    Skokie Swift.  And because that was restoration project of old

5    building and turning to green project, he asked me to work

6    with this project.  And I was the under the impression that

7    this Sacred Heart School is a Catholic school with architects.

8    Q.   What is a green project?

9    A.   Green, that means we were restorating exactly the building

10   exactly the way it was built in almost over a hundred years

11   ago but adding green feature like geothermal, heating and

12   cooling.  I design system for interior which will be -- which

13   will work for people that means the light, the fresh air will

14   start up when people walk into the room.  So we try to turn

15   this into elite project.

16   Q.   What was the initial contract price?

17   A.   I don't remember from top of my head, but I think it was

18   2.1 million.

19   Q.   Were you paid 2.1 million?

20   A.   Of course not.

21   Q.   How much were you paid altogether?

22   A.   I don't remember --

23            MR. WILLIAMS:  Objection.

24            THE COURT:  Hold on.

25   BY THE WITNESS:

Bochenek - direct

1    A.   -- exactly.

2            THE COURT:  Ground?

3            MR. WILLIAMS:  Relevance.

4            MR. McNEIL:  The ability to pay --

5            THE COURT:  I'll let it go for the moment.

6            MR. WILLIAMS:  Okay.

7    BY THE WITNESS:

8    A.   I don't remember because the project was basically they

9    decided to change their way to finish this product.  There was

10   a problem with architect representative.  The project was

11   taking much longer, cost much more money, and they decided to

12   change this green project to regular project and terminate our

13   contract and try to finish with one of the board members of

14   the school.  And we received letter that we will receive

15   380,000 and because we wait like four months without any the

16   payment.

17   BY MR. McNEIL:

18   Q.   When did the project start?

19   A.   If I have good recollection, September of 2007.

20   Q.   And when was your involvement in the project terminated?

21   A.   March.  March 2009.

22   Q.   At the time that it was terminated were you fully paid?

23   A.   Of course not because that was -- that was major problem

24   with project.  The payment was delayed, delayed, and every

25   payment we have to wait longer and we end up borrowing money

Bochenek - direct

1    to continue working.

2    Q.   And at the end when you were terminated, how much was due

3    to you?

4    A.   $380,000.   We received letter, stamped and signed by

5    school that we will receive this payment in a maximum three

6    months from moment of leaving job site.

7    Q.   Since then how much have you been paid?

8    A.   Zero.

9    Q.   Did you file suit to try and collect that money?

10   A.   Yes, I did.

11   Q.   That wasn't successful, right?

12   A.   It was unsuccessful because by other attorneys who

13   represent school and they were involved with school because

14   they were on Board of Directors, they represent school for

15   free and they go to technicality to which I was completely

16   lost, technicality of computers, technicality of phones and

17   this.  And we did record whatever we could, but I have to

18   admit I'm computer idiot, so I have to rely on different

19   people.

20   Q.   So the money you weren't paid is gone forever essentially?

21          MR. WILLIAMS:   I'm going to --

22          THE COURT:   Mr. McNeil, the financial difficulties

23   encountered on this project are not a defense to the wage

24   claims asserted in this case.  What's the relevance of this?

25          MR. McNEIL:   Well, I think there is a requirement

1    that the plaintiff show in a Wage Payment Collection Act some

2    willful act, an intentional willful act.  And inability to pay

3    is a defense.  If the employer cannot pay, it doesn't violate

4    the statute, the criminal side at least.  The liability is

5    still there.

6              THE COURT:  This isn't a criminal case.

7              MR. McNEIL:  No, I'm just saying the liability is

8    still there, but if there's no ability to pay, there were no

9    ramifications.  There are penalties that are requested.

10   You're right it's not a criminal case.  It's a civil case.

11   But the civil penalties that are being requested by the

12   plaintiff thwart the action of minimum wages.

13             MR. WILLIAMS:  Your Honor, I think the section of the

14   Wage Payment Collection Act he's referring to is Section 13,

15   but we are seeking recovery under the definition of employer

16   under Section 12.  Section 13 is for officers when there's a

17   knowing violation of officers, but Section 2 does not require

18   a willful violation or knowing violation.

19             THE COURT:  You said Section 2.  Section 2 or

20   Section 12?

21             MR. WILLIAMS:  No, Section 2 versus Section 13 of the

22   Illinois Wage Payment Collection Act.

23             MR. McNEIL:  So there is a willfulness requirement.

24             THE COURT:  We are not proceeding under that

25   requirement, not proceeding under that statute.  That's not

Bochenek - direct

131

1     their legal claim.

2             MR. McNEIL:  The 2 percent penalty statute I think

3     also though it would require --

4             THE COURT:  2 percent is an interest provision, is it

5     not?

6             MR. McNEIL:  No, it isn't.  There's another penalty

7     that accrues at 2 percent a month.  So it's 2, 4, 6, 8, 10,

8     12.

9             THE COURT:  All right.  I'll hear the testimony, but

10    I'm quite skeptical of the relevance of this line of

11    questioning.

12            MR. McNEIL:  Actually, I have no more to say on that

13    point.  I just want to make the point that there's an

14    inability to pay.

15            THE COURT:  All right.

16    BY MR. McNEIL:

17    Q.  At the time that you were terminated on the project, did

18    any of the entities owe any wages?

19    A.  Yes.  We have -- we have record base on the amount of

20    subcontract they did.  And we have hour on record which I

21    think for these three people who were testifying was $21,000

22    altogether.  And they're supposed to be paid when we receive

23    money from the school.

24    Q.  You say we -- that's when it was supposed to happen?

25    A.  Yeah.

Bochenek - direct

1  Q.  Did you have some agreement with these three individuals?

2  A.  Of course they know.  They know.  That's why they were

3  working here and the late payment and their payment was late.

4  Q.  How did they know?

5  A.  Because I talked to them.  And besides of that, each of

6  them signed subcontractor agreement knowing that they are not

7  receiving payments every week.  They are receiving payments

8  when we receiving payment because I cannot take obligation

9  like this on company which basically after years before didn't

10  have financial backup to do something like this.

11  Q.  Did anyone file any liens?

12  A.  They filed lien for I think $42,000.  And this lien

13  actually break all my relations with school because --

14  Q.  When were the liens first filed?

15  A.  Pardon me?

16  Q.  When were the liens first filed?

17  A.  The lien was filed by three people:  Bester, Jaworski and

18  Moskal.

19  Q.  The three plaintiffs in this case?

20  A.  Yes.

21  Q.  When did they file the liens?

22  A.  When?  I think that was in February.

23  Q.  And when were you thrown off the job?

24  A.  They were.

25  Q.  When were you terminated off the job?

Bochenek - direct

133

1    A.   They stop working end of January, and February they work

2    in and out.   And finally they said we didn't receive money,

3    we're not coming to work.

4    Q.   Did they file the lien before or after you were

5    terminated?

6    A.   I never terminated.   They decide they weren't going to

7    work when they were not paid.

8    Q.   My question is did they file the lien before or after your

9    company was terminated as general contractor?

10   A.   Before of course.   That was before.

11   Q.   Do you have any personal knowledge as to whether that

12   influenced the decision of Sacred Heart to get rid of you that

13   these liens were filed?

14   A.   Well, that was their decision after they find out lien and

15   find out that legal action was started against school because

16   after that moment they were promising us payout which was

17   delayed from October, and it was February we still didn't

18   receive money.   Supposedly the payout went through and bank

19   was holding the payout, but we never received one penny.

20         MR. McNEIL:   Could I have a minute, Your Honor?

21         THE COURT:   Yes.

22         MR. McNEIL:   Thank you.

23   BY MR. McNEIL:

24   Q.   Did any of the workers on the project sign any agreements

25   referring to themselves as independent contractors?

Bochenek - direct

134

1   A.   Every -- everyone who was working in the school project

2   signed subcontractor's agreement and was based on

3   subcontractor payments.

4   Q.   When you were still at Sacred Heart School, what entity

5   was the general contractor on the project?

6   A.   What name was?

7   Q.   What company was the general contractor?

8   A.   Master Hand Contractors.

9   Q.   Master Hand?

10  A.   Yes.

11  Q.   And Masterhaus's role in the project, if any, was what?

12  A.   Masterhaus was working on the partial demolition and

13  excavation and jobs which was usually assigned by -- for

14  Masterhaus.

15  Q.   How about Purcon?

16  A.   Purcon was at that time subcontractor's company which was

17  paid through subcontractors.

18  Q.   So all the wages flowed through Purcon?

19  A.   The payments to subcontractors went through Purcon, and

20  Purcon was the one which have payment to smaller

21  subcontractors which were not part of sworn statement.  Every

22  larger subcontractor was stated on sworn statement.

23  Q.   So Masterhaus is a general contractor.  How many

24  subcontractors were there?

25  A.   It's very difficult to say.  But I would say calculating

Bochenek - direct

1   all people working there was way over 60.

2   Q.   How many were employees?

3   A.   None of them.

4   Q.   They were all independent contractors?

5   A.   Yes.

6   Q.   Tell me, when the project was ongoing and everybody was

7   busy, what we'll call the normal time, what was your routine

8   in managing the project?

9   A.   When we were signing contract, we signed that work can

10  only be scheduled between 7:00 and 5:00.  After 5:00 we have

11  to leave job site no matter what.  And that was requirement by

12  Sacred Heart School, and we tried to obey those rules.  It

13  doesn't mean that we always start 7:00.  Some people were

14  coming 7:00.  Some were coming 8:00.  Some were coming later.

15  Q.   So everything you remember about your own routine in an

16  average week, a regular week, what would you do?

17  A.   One routine I have was every -- every Tuesday we have

18  subcontractors' meeting, and that was requirement by school.

19  And during this meeting, I was present and some of trade

20  subcontractors were present.  And it was school manager,

21  usually school board president, vice president, sometimes was

22  more people from school, representative of architect and

23  engineer which was hired by school.  And they all were asking

24  me questions, where we are and how far the project is going,

25  what was done last week and schedule of prediction of next

Bochenek - direct

136

1   weeks.

2   Q.  I would like you to turn to Exhibit --

3           MR. McNEIL:  Does he -- off the record, Your Honor.

4      (Off the record.)

5           MR. McNEIL:  Could I have a moment to get the

6   exhibits back up?  I thought they were up there.

7           What I would like the witness to have in front of him

8   is Plaintiff's Exhibit 8.  Can I just give him my copy?  May I

9   approach, Your Honor?

10          THE COURT:  You may.

11  BY MR. McNEIL:

12  Q.  I would like you to look over that document and let me

13  know when you're done familiarizing yourself with it which

14  shouldn't take long because you've been looking at it all day.

15  A.  Okay.

16  Q.  This purports to be a summary of payments made and amounts

17  owed.  The second column, rate of pay, says $15 an hour.  How

18  many of the employees -- how many of the workers on the

19  project, the independent contractors, how many of them were

20  paid an hourly rate?

21  A.  None of them.  Mr. Bester was saying that he was paid $15

22  per hour.  And usually most of smaller subcontractors, they

23  have in their mind what they like to make in week in their

24  schedule, and they were dividing if they are below or above

25  that.  If they were above that because job was done faster,

Bochenek - direct

137

1    then they were happy.  If they were taking longer and their

2    payment was much lower, then they were obviously unhappy.  But

3    this --

4    Q.  Did you say Bester was entitled to $15 an hour?

5    A.  No.  Bester was paid by project, and that was never an

6    issue of 15, 20 or $30 because if we take his own notes, where

7    he was putting bullet points, money requested for certain job,

8    some of this job was much greater than $30 per hour.  So how

9    he can produce something like this, I don't know.  I don't

10   want to even look at this because I said long time ago that

11   that was not prepared by him.

12   Q.  So the three plaintiffs were to be paid at what rate or in

13   what manner were they to be paid?  As independent contractors?

14   A.  Of course.  They were paid as independent contractors.

15   Q.  As independent contractors, tell us what that means.  How

16   do you pay an independent contractor?

17   A.  Every job, every job have price, especially when we have

18   sworn statement.  Every job have certain price for this

19   portion of work.  And whoever was smaller, people which, for

20   example, like Moskal, he was hired as a worker long time ago,

21   and I trained him.  And when I fire him, I rehired him as an

22   independent subcontractor.  And everyone has to sign agreement

23   that he understand he is independent subcontractor.  His

24   payment is when we receiving money, they immediately receive

25   money for portion of work they done.

Bochenek - direct

138

1        Problem is people have to leave.  When school was not

2   paying three months, we have to come up with some money

3   because they have payment, car payment.  They have -- they

4   have house payment.  They have to put bread on table.  So we

5   were trying to come up with some money based what they were

6   preparing on their statements, and that's how they were

7   receiving amounts of money.  Of course they were complaining

8   the same like we were complaining to school and then other

9   project was delaying their payments.  But it was obvious that

10  I cannot produce money and nobody can, and they have to wait

11  when we -- when we receive money.

12  Q.  Looking at Exhibit 8, which is a form.  This is also used

13  as Exhibit 6 and Exhibit 2.  Let's just go across the columns.

14  A.  I don't -- I only have Exhibit 8.

15  Q.  Yeah.

16  A.  So are we talking about 8?

17  Q.  8 is the only one you need.  Rate of pay, we already

18  talked about.  You said there was nobody on an hourly rate of

19  pay.

20       Hours worked, just look down that whole list of hours

21  worked and let me know what your impression is as to how

22  accurate that is.  Not your impression but just tell me how

23  accurate it is.

24  A.  Maybe they use hours which was counted by Joe Karpinski,

25  maybe, because Joe Karpinski, he is --

1   Q.  What's the last name?  I'm sorry.

2   A.  Okay.  Well, anyway, I don't know how to come up with

3   these hours.  They were putting on there work scope.  They

4   were putting when they were coming, when they were leaving.

5   And based on this, maybe they were calculating how many hours

6   they did work, but I cannot -- I cannot even answer that

7   because I was never involved with hourly rate and a spread

8   like this because I am not bookkeeper.  I prefer to be on job

9   site and not stay in office.  That's why I try to have all the

10  time some help, clerical help, in our office as long I was

11  able to pay.

12  Q.  Produced today and in discovery were time cards, or

13  documents that are entitled time card.  The traditional

14  concept of a time card is you punch in, punch out, sign in,

15  sign out and that those are your hours for the week.  Is that

16  the way in which time cards were used on this project?

17  A.  No.  Long time ago in company when it was still in

18  Chicago, we have clock.  Everyone, every employee at that time

19  have to punch in, leaving for lunch, punching out, then

20  punching in and leaving the building, punching out.  We

21  have --

22  Q.  That was ancient history at this point?

23  A.  Well, that was long time ago.  And we have forms of time

24  cards which was foldable three ways.  And this time card's

25  clock, we have on Chicago Avenue, we could use on every job.

Bochenek - direct

1   Time was change and then we change this, this way of dealing

2   to subcontractors.  Then we never require subcontractors to

3   punch in, punch out and necessary to record their time.  They

4   were recording their time --

5   Q.  You're beating up your microphone a little bit.

6   A.  Okay.  I'm sorry.  They were recording their time themself

7   because they want to know where they are with total payments

8   for themself.  But I was not involved.  Nobody was involved.

9   Nobody was checking.  Only one moment they were checked when

10  Joe was putting time, whoever was coming, and that was in

11  relation to every person walking to building of Sacred Heart

12  and leaving this building, including building manager.

13  Q.  Who is Joe?

14  A.  Joe Karpinski.  It's --

15  Q.  Can you spell the last name?

16  A.  Karpinski, I cannot spell that.

17  Q.  K-a-r-p-i-n-s-k-i?

18  A.  He is uncle of my ex-wife, and he was retired.  So I trust

19  him 100 percent because of school requirements who is working

20  and when is working, I ask him to keep log of every person

21  coming to Sacred Heart School project and leaving this project

22  so we can have his schedule, who was working in the building

23  and what he was doing because what people was writing, that

24  was absolutely not trustworthy because he was the one checking

25  that they were saying, we start 7:00, we finish 5:00.  And

Bochenek - direct

1   really he was saying no, you come in at 9:00, 9:30.  They were

2   leaving much earlier.  And every subcontractor on this job

3   where we were talking to him or I was talking personally, they

4   agree.  They agree with Joe's timing of people coming in and

5   leaving the building.  This is including electrical

6   subcontractors.  This is including masonry subcontractors.

7   This is including every person coming to the building.

8   Q.   Did the time cards have any other uses?

9   A.   That was no time cards.  We can call this report cards.

10  Time cards is someone -- where someone is recording time

11  coming in and leaving.  And this is -- that was copy of time

12  cards used long, long time ago on Chicago Avenue.  And I was

13  requesting that they not going to make copies of this and they

14  not going to use this.  They use regular notebook because we

15  need to know what part they doing and how much they paid, they

16  were paid, and how much more they going to be paid to fulfill

17  our obligation for each part of job.  They still kept doing --

18  kept using this document.  I never expect that this will hurt

19  me as a time card because time cards has to be recorded, and

20  this was not.

21  Q.   I'm going to hand you now what's been marked as

22  Plaintiff's Exhibit 3.  Tell me what that is, if you know.

23  A.   This is letter from Master Hand Contractors date

24  August 25, 2006, To Whom It Might Concern, signed by me,

25  requested by Mr. Dariusz Jaworski.  I give him this letter

Bochenek - direct

1   because he was begging me for some letter stating that he is

2   employed by company.  Why?  Because his wife was not receiving

3   visa because they were saying they need to have form -- any

4   form of his permanent employment.  And I did this only to this

5   purpose, that his wife receive visa, and he can be back

6   together with wife.  He was explaining me long story why wife

7   didn't receive visa.  He got green card.  I don't know what

8   complication was.  But I always help people, and that was

9   letter to help him get his wife.

10  Q.  Did you question the accuracy of Exhibit 8?  That's the

11  summary -- summary exhibit of -- summary exhibit of plaintiff

12  Bester's back payments of statutory damages.  Was this

13  document, to the best of your knowledge, accurate?

14  A.  No, it's not.  It's not an accurate document.

15  Q.  How about the 53 -- there's a number of entries, 53 hours

16  of work, a couple beyond 40, but almost all of the weeks that

17  are listed in the summary show a lot of hours.  Were things

18  that busy?

19  A.  And how I know how many hours he was working -- you know,

20  if I now doing all this, then I'm Superman.  I was controlling

21  their jobs.  I was telling them what to do.  I was with them

22  telling them what materials they have to do.  I was checking

23  their time cards, supposedly time cards, checking their hours,

24  paying them checks.  I did everything which is impossible for

25  one person.  Only thing what I was advising them to do is the

Bochenek - direct

1    job has to be done per customer specifications, which is

2    requested by every subcontractor.  Also, another thing, they

3    cannot start earlier than every owner request; they cannot

4    stay longer than owner request.  That's only thing I was able

5    to control.  If I control the way they were saying, we

6    wouldn't have discussion with Sacred Heart School how many

7    things they were not unhappy and how many things we have to

8    correct because I know my job for -- and I can say I'm expert

9    of the job on the field.  But because I cannot control every

10   subcontractor, I am leaving them freewill to do knowing that

11   they are professionals.  And if we are finding out that

12   they had -- it's problem with this job, they have to correct

13   this.

14   Q.  Did you ever engage in direct supervision of any of these

15   subcontractors?

16   A.  No.

17   Q.  Who supervised them?

18   A.  They themself.  Of course they were asking me what has to

19   be done and how it has to be done, but I didn't supervise

20   them.  Absolutely I didn't supervise them the way you

21   supervising employees.

22   Q.  Why was that?

23   A.  Pardon me?

24   Q.  Why was that?  Why wouldn't you --

25   A.  Because they were subcontractors.  I mean, of course if

Bochenek - direct

1   they were not showing up for two, three days or they were

2   showing up late, I was upset because I have people, owners of

3   project upset that nothing was happening.  And then I was

4   ready to change some of them if there was no progress, but

5   that was only supervision I can have.

6   Q.  What's the word in Polish for "subcontractors"?

7   A.  *Poddostawca*.

8   Q.  What's the word in Polish for "employee"?

9   A.  *Pracownik*.

10  Q.  Are there any special meanings to either word?

11  A.  Yeah.  This is the difficult part between Polish and

12  English, that in Polish and in Poland, everyone who is working

13  is worker.  And in Polish, *praca* is work.  *Pracownik* is

14  worker.  And you're going to any side of Poland or anybody

15  from Poland asking when he's subcontractor, really likes the

16  subcontractor, are you a worker?  Yeah, I am because I'm

17  working, because this is my job.  And very often it's a big

18  confusion between Polish word of worker and subcontractor.

19  Subcontractor in Polish, which is *poddostawca*, is used only in

20  legal language of documents, not in regular verbal language of

21  people.  So that's the biggest confusion and that's why

22  everyone who is working on job site, it's worker in Polish.

23  Q.  Did you impose deadlines on the independent contractors?

24  A.  There was deadlines.

25  Q.  For the particular project?

Bochenek - direct

1  A.  Yes.  Yes, we had -- we had deadlines and every -- almost

2  every deadline was extended because that was problem between

3  architect, between designing part, which I was involved.  And

4  mainly on this project I was involved during the week of

5  trying to design something and work with architect and

6  engineer how we can resolve issue of construction, how this

7  building can be built because some request which was requested

8  by engineer or architect was impossible to do it.  So I

9  understand that none of people working on project was able to

10  do it.  And this is -- this is the real issues of Sacred Heart

11  project.  And that's where I was involved, not on a daily

12  basis, checking if they working, not working.  That was way

13  too big a project to -- especially for me to control on a

14  daily basis.

15  Q.  So the amounts that the independent contractors were

16  entitled to were unpaid solely because of your financial

17  situation that was created in turn by the owners not paying

18  you?

19  A.  I didn't understand question.

20  Q.  The reason why the employees of your entities weren't paid

21  was that there's simply no money to pay them?

22  A.  Well, if -- that's why -- that's why I always am fair and

23  honest in dealing through.  And before I work with anybody or

24  any project saying this is sworn statement, this is amount of

25  money we have, and we have to be paid to pay everybody else or

Bochenek - direct

1   they are paid directly from sworn statement.  If you have

2   people who are not paying you, what you can do?  You can only

3   go to court.  That's what I tried to do, go to court.

4   Q.  I'm sorry.  So those employees who -- those workers, I'm

5   sorry, who had money coming at the end of the company's

6   involvement in the Sacred Heart project, those workers, none

7   of them was treated as an employee?

8   A.  Nope.  That's why they signed subcontractors' agreements.

9   Q.  None of them were promised an hourly rate, right?

10  A.  I was working for union company, and I received check

11  every week.  Even though company was broke for three weeks,

12  they have no money, they were giving me check because this is

13  the worker.  You have to have check.  Otherwise you cannot --

14  I mean, it may be breaking law.  I don't know.  But I was

15  receiving check where it was no money, and I can now cash out

16  from big company.  And that's why I didn't hire any employees

17  because I cannot give to anybody comfort of that.  Even office

18  people which was treat as employees, because they were coming

19  to office which I can directly control them, their check was

20  not paid on time when we didn't receive.  And I tried to come

21  up with money every week because that was my obligation to

22  office clerk, like when Agnes was working or when other girls

23  was working, I understand that they have to receive payment

24  every week.  But when we have no money in company, I could

25  give them also check which they have to hold.

1  Q.  So the employees were not guaranteed an hourly rate of

2  pay.  They were not paid because of an inability on the

3  company's part to pay.

4  A.  Is that a question?

5  Q.  Yes.

6          MR. WILLIAMS:  Objection.

7  BY THE WITNESS:

8  A.  There was no employee, so I don't know how I can answer

9  that.

10 BY MR. McNEIL:

11 Q.  Well, your position regarding the --

12 A.  We have log which we were trying to maintain how much work

13 was done by all people on job site, especially when extension

14 of nonpayment start to be longer and longer.  And I always --

15 I'm always fair, and I said this -- three testifying guys

16 today, we have on our log that when we have payment from

17 school, we have to pay them altogether around 21,000.  I try

18 to -- try to combine this numbers because I was shocked when I

19 hear that they put lien of 42,000.  And I tried to talk to

20 them, from where they come up with 42,000?  Which was nothing

21 on the record, at least at my knowledge, and they don't want

22 to even say.  Well, 42,000, you have to pay us.  You're not

23 paying us, we will sue you.  And, of course, then the number

24 was growing and growing as soon as they start to be

25 represented by this foundation who was involved.

Bochenek - direct/cross

148

1   Q.  Did you have to teach any of the independent contractors

2   how to perform jobs that were peculiar to the Sacred Heart

3   project?

4   A.  We had -- with every subcontractor, we try to have weekly

5   meetings saying where we are, where we going.  If I was on job

6   site, I have to admit -- especially Tuesday, I have to admit

7   that I try to share my knowledge with every subcontractor,

8   every person working on job site because of my experience with

9   different construction field.  But they are taking, didn't

10  taking.  That was -- that was -- we were finding that week

11  later.

12          MR. McNEIL:  No other questions, Your Honor.

13          THE COURT:  Cross-examination.

14                      CROSS-EXAMINATION

15  BY MR. WILLIAMS:

16  Q.  Good afternoon, Mr. Bochenek.

17  A.  Good afternoon.

18  Q.  You're the owner of Master Hand, Masterhaus and Purcon; is

19  that correct?

20  A.  Yes.

21  Q.  Okay.  What were the gross receipts of those three

22  companies in 2006?

23  A.  Gross?

24  Q.  Gross receipts?  What was the total income for those three

25  companies in 2006?

Bochenek - cross

1  A.  I cannot recall that.  That was 2006.  I wish I can have

2  that now, but no.

3  Q.  Did you file taxes in 2007?

4  A.  I think so.  My bookkeeper filed taxes.

5  Q.  Who is your bookkeeper?

6  A.  Palmer.

7  Q.  Palmer?

8  A.  Palmer Taxes.

9  Q.  Is this an accounting firm?

10  A.  Yes.

11        MR. WILLIAMS:  I'm marking Exhibit -- Plaintiff's

12  Exhibit 9 for identification.  I thought we premarked all of

13  these.

14        Let the record show I'm showing to opposing counsel

15  Exhibit No. 9.

16  BY MR. WILLIAMS:

17  Q.  I showed you what's marked Exhibit 9.  Do you recognize

18  that document?

19  A.  Yes, it's a tax return.

20  Q.  And did you sign that document?

21  A.  I don't see my signature.

22  Q.  Do you recall producing this document to us in discovery

23  in this case?

24  A.  Yeah, I produce everything I have.  I have no reason to

25  hold anything.  So I think you received this from me, but I

Bochenek - cross

1    didn't sign it.

2    Q.   Okay.  If you look at page trial document number 456, the

3    top page.  It says these are the 2007 taxes, Form 1120 for

4    Masterhaus Builders, Inc.?

5    A.   Yes.

6    Q.   Is that what this document is?

7    A.   Yes, the tax return.

8    Q.   Did you assist in the preparation of this document?

9    A.   You see it's signed by Palmer Tax and Consulting

10   Incorporation.  They have all documents from my company.  They

11   are doing tax return and then they send it electronically.  So

12   I don't know if I signed it or no.  I don't remember.

13   Q.   But did you produce this document in response to requests

14   for tax filings for Masterhaus Builders, Inc. in this

15   litigation?

16   A.   I produce every document you received.  So if you have

17   this, then I -- obviously I produced it.

18   Q.   Are these your tax filings for 2007?

19   A.   I don't see in the stamp here of IRS.  I don't see any of

20   my signature.  I see copy, and I can only comment what I see.

21   I don't remember what it was, did I sign that because it was

22   2007.  Now we have 2016.  I am not superhero with my brain to

23   remember that long a piece of paper especially that I hate

24   papers.  I'm sorry to say that.

25   Q.   Can I ask you to look at line 1A of this document.

Bochenek - cross

1   A.  Yes.

2   Q.  Okay.  You see where if you go to the right, it says

3   251,511?

4   A.  Yes.

5   Q.  And if you see the left it says 1A, gross receipts?

6   A.  Where is gross receipts?

7   Q.  You see the number 1A at the top?

8   A.  Yeah.

9   Q.  Do you see the word --

10   A.  Gross receipts in sales, yes.

11   Q.  Right.  Were Masterhaus's gross receipts in sales that

12   year 251,511?

13   A.  This says this.  I can comment only what is on this

14   document.  It's $251,511.

15   Q.  As you sit here today, is that an accurate recollection of

16   the document?

17   A.  I don't have recollection of this document.  I said that.

18   I'm just reading what I have in my hand.

19   Q.  Could you look at page 464, trial document number 464 in

20   the lower right-hand corner.

21   A.  That I have.

22   Q.  Okay.  Can you look at line 1A again.

23   A.  Yes.

24   Q.  And it says gross receipts or sales, 356,807?

25   A.  Yes.

Bochenek - cross

1  Q.  Is that an accurate reflection of the gross receipts for

2  Purcon Ltd. that year in 2007?

3  A.  That's what it says on this document in front of me.

4  Q.  Is this a document you produced to us in discovery?

5  A.  Yes, I did.

6  Q.  Okay.  At the bottom it says Palmer Tax.  Was that

7  prepared by Palmer Tax & Consulting?

8  A.  Yes.

9  Q.  Is that your accountant?

10  A.  Yes, it is.

11  Q.  Do you have any reason to believe that's not an accurate

12  number?

13  A.  I don't think so.  I think they prepare everything based

14  on all paper, what we have.  And I also see that we have

15  negative balance of $119,000 if I read this income.  It's

16  negative balance of 119,266 if this is --

17  Q.  Yes, but I'm asking you to look at the gross receipts.

18  A.  Yes, I read this.  This is document I'm reading from.

19  Q.  Would you agree -- if you need a calculator, let me know.

20  But would you agree that 251,000 plus 300 --

21         THE COURT:  I'll take judicial notice it's over a

22  half million dollars, Counsel.

23         MR. WILLIAMS:  Okay.

24  BY MR. WILLIAMS:

25  Q.  Did you file taxes in 2008?

Bochenek - cross

153

1   A.  I don't know.

2   Q.  Did you file taxes in 2009?

3   A.  I don't know.

4   Q.  Did you file taxes in 2006?

5   A.  If taxes 2007 here, then I presume we have taxes in 2006.

6   Usually Palmer, when they were paid, they did our taxes; they

7   were not paid since moment we didn't receive money from

8   school.  So since then we have problems.

9   Q.  So if you didn't produce tax returns for 2006 for these

10  companies, do you have an explanation for that?

11  A.  I don't know why it's not produced.  I produce every paper

12  I have.  You can ask Palmer for that.  You have Palmer.  You

13  can ask them.

14  Q.  And in 2008, did you -- if you didn't produce --

15  A.  If we have it, then you will have it.

16  Q.  As you sit here today, do you have any reason to believe

17  your gross receipts weren't at least over half a million

18  dollars for the three companies?

19  A.  Can you repeat this?

20  Q.  As you sit here today, we don't have your tax returns for

21  2006, 2008.  Do you have any reason to believe that the gross

22  receipts of Masterhaus, Master Hand and Purcon were not more

23  than half a million dollars?

24  A.  I don't know.

25  Q.  Okay.  But you don't know that it wasn't?

Bochenek - cross

154

1   A.  I don't know.

2   Q.  Okay.  Who contracted -- now I'm going to ask you

3   questions relating to the period of 2006 through 2009, okay.

4   If I want a different period, I'll let you know, but otherwise

5   I'm talking 2006 to 2009, okay.  Who contracted with the

6   workers, the people you call subcontractors?

7   A.  Usually I did.

8   Q.  Okay.  And you said they were independent contractors or

9   subcontractors, not employees; is that correct?

10  A.  Yes.

11  Q.  Okay.  What do you see as the distinction?

12  A.  Major distinction because if I have employees in past,

13  they have to do exactly job I was asking.  They have to be

14  exactly on time, and they have to do it my way or highway.

15  With independent subcontractors, I let them do it their way

16  and just guiding what is requested by owner.  And if they

17  making mistake, I let them make mistake because I am not

18  controlling them, and that has to be corrected per owner's

19  request.  This is major difference between freewill, you can

20  do what you want to do, and fully control.

21       And also the same thing with time.  We have

22  capability with company because I invest money.  When we had

23  employees, we have capability to have time cards.  On every

24  job I invest money to have magnetic time cards.  We decide

25  that we going to use this only for myself and whoever was in

Bochenek - cross

1    the building that time which was office people, nobody else.

2    And I never use time cards for independent subcontractors.

3    Q.  Okay.

4    A.  We have problems because they're not coming on time or

5    dropping a day or two.

6    Q.  Okay.  Thank you.  Are you familiar with the Employee

7    Classification Act?

8    A.  Barely.

9    Q.  Okay.  Are you familiar with the recordkeeping

10   requirements of the Employee Classification Act?

11   A.  Barely.

12   Q.  Okay.  I'm going to ask you some questions about records

13   to see if you have them because you said you didn't keep some

14   and didn't keep others, and I just want to be clear.

15           Did you keep a record of the names and addresses,

16   contact information of people who --

17   A.  Every subcontractor I try to have their names, phone

18   numbers and everybody else, yes.

19   Q.  Did you keep some kind of record of the type of work

20   performed, the total number of days and the hours worked?

21   A.  I keep record only what they were doing on job site.

22   Q.  Did you keep a record -- so you did not keep a record of

23   the hours worked?

24   A.  Hours worked, I don't care.  I mean, they can write

25   whatever they want.  I was not requesting that.

Bochenek - cross

1   Q.  Did you --

2   A.  I didn't keep record of hours, period.

3   Q.  Did you keep track of the method, the frequency and basis

4   on which wages were paid or payments made?

5   A.  That means I paid them and that this was out, and then

6   whatever they did, they received money.  So we have record of

7   checks they received, and on checks we were writing what job

8   it is.  It's paid in full.  We're saying paid in full.

9   Q.  Do you have copies of those checks?

10   A.  Whatever was produced to you.  We have everything.

11   Q.  No checks were produced to us.

12   A.  I don't know.

13   Q.  Are you saying now that you have checks?

14   A.  Should be.

15   Q.  You have copies of checks for 2006 to 2009?

16   A.  It should be.  I don't know why it was not produced.

17   Q.  Okay.  Do you have any other documents reflecting what

18   people were being paid for?

19   A.  No.

20   Q.  Do you have invoices, billing statements or other payment

21   records including dates of payments and any miscellaneous

22   income paid or deductions made?

23   A.  If they were giving us, for example, like Bester, they

24   were giving us statements of amounts of money, that was only

25   copy we kept.  That was it.

Bochenek - cross

1    Q.   Okay.  Do you have copies of any contracts, agreements and

2    applications and policy or employment manuals?

3    A.   Yes, we have, and you were -- you have copy of that where

4    we have subcontractor's agreement signed with every

5    subcontractor working for our company.

6    Q.   And you're saying you produced subcontractor agreements?

7    A.   Yes, I did.  Yes.

8    Q.   Okay.  Did you have subcontractors sign the agreement on

9    each new job?

10   A.   Not always, no, no, because that was smaller jobs.  We are

11   not doing this with them.  They are subcontractors.  We are

12   not company who can keep that kind of bookkeeping.  So that

13   was mainly by word.

14   Q.   Do you have any reason -- any idea why you did not produce

15   the subcontractor agreement?

16   A.   I produced subcontractor agreement.  I'm surprised I

17   didn't see it.  Signed by every person who testified today

18   except Agnes.

19   Q.   Did you point out to your attorney that he was in

20   possession of subcontractor agreements that were produced to

21   us?

22   A.   I didn't see necessity.  But definitely if you don't have

23   them, I will look through attorney document and find out.  And

24   the subcontractor agreement -- just in case, subcontractor's

25   agreement was in two different languages because we had people

1 saying we don't understand English, there was Polish and there

2 was English part.

3          MR. McNEIL:  Your Honor, I don't know why we're

4 getting into written discovery at the end of the trial.

5          THE COURT:  Well, I will tell you why, Mr. McNeil,

6 because apparently there have been very significant documents

7 that the plaintiff claims have not been produced.  We are

8 going to have to get to the bottom of that situation, but I

9 want to finish taking the evidence before we do.  If I find

10 there have been documents relevant that were requested in

11 discovery that have not been produced, there will be

12 significant sanctions to be imposed for the nonproduction of

13 those documents which may include a grant of a default

14 judgment.

15          MR. WILLIAMS:  Thank you, Your Honor.

16          I'm marking for identification purposes Plaintiff's

17 Exhibit No. 10.

18          Let the record show I showed Plaintiff's Exhibit

19 No. 10 to defendant's counsel.

20 BY MR. WILLIAMS:

21 Q.  Mr. Bochenek, I'm going to ask you to look at Plaintiff's

22 Exhibit 10 that you have in your hands there.

23 A.  Yes.

24 Q.  Do you recognize this group of documents?

25 A.  Yes.

Bochenek - cross

1    Q.   What is this?

2    A.   This is the hours and the jobs which was kept by Joe

3    Karpinski.

4    Q.   And you provided this to plaintiff's counsel in this

5    litigation?

6    A.   Yes, of course.

7    Q.   Okay.  How did you get a copy of it?

8    A.   We had copy because based on this, I was able to talk to

9    every Tuesday meeting where we are, what we doing and that

10   this is I see missing some -- some things there because that

11   was more of this that was also -- also larger subcontractors

12   with names on the same document, and I don't see that.

13   Q.   Mr. Karpinski you testified earlier was someone who was

14   monitoring the work on the job site at Sacred Heart?

15   A.   He was helping me because he is retired.  I trust him

16   because he is uncle of my wife, and I know he is truthful.

17   And whatever he was preparing, that was base for me to talk on

18   every Tuesday meetings with the school representative.

19   Q.   So was this record a record kept on behalf of Master Hand,

20   Purcon and Masterhaus?

21   A.   That was record kept on behalf of Sacred Heart School

22   because Sacred Heart School required it from us so we can tell

23   them who was working and what was working.  You have only

24   record on these individual subcontractors.  You don't have

25   record, you're not showing me record of every subcontractor.

1   Q.   Okay.  But Mr. Karpinski was working on your behalf; is

2   that correct?

3   A.   He was helping me because he was never paid for his work.

4   Q.   Okay.  But he was doing it for you?

5   A.   Yeah.

6   Q.   Okay.  And he was keeping track of the time of the

7   subcontractors, what you call subcontractors; is that correct?

8   A.   Coming to job site and what was done and leaving site.

9   Q.   Okay.  And is this -- as you look at it, is this an

10  accurate reflection of these records that were kept by -- on

11  behalf of Master Hand, Masterhaus and Purcon?

12  A.   Mainly.  Mainly.  I was finding also some discrepancies

13  between what he was writing and what was accrued but mainly.

14  Q.   Well, is there something specifically that is not accurate

15  that you could point to?

16  A.   No, it was too long ago.  It was coming to meetings where

17  school was saying no, this is not accurate.  And I cannot have

18  any problems to request Mr. Karpinski because he was not my

19  employee.  He was doing this to help me.  So I have no regret

20  to him.

21          MR. WILLIAMS:  So, Your Honor, I move to enter

22  Exhibit 10 into evidence.

23          THE COURT:  Any objection?

24          MR. McNEIL:  No, Your Honor.

25          THE COURT:  It will be admitted.  Did you intend to

1   introduce Exhibit 9, Mr. Williams?  The tax --

2          MR. WILLIAMS:  Yes, I apologize.  Yes.  I move to

3   enter Exhibit 9 into evidence.

4          THE COURT:  All right.  Plaintiff's Exhibit 9 will

5   also be admitted.

6     (Plaintiff's Exhibits Nos. 9 & 10 were received in

7        evidence.)

8   BY MR. WILLIAMS:

9   Q.  So can you look at Exhibit No. 10 and the first page

10  again.

11  A.  Yes.

12  Q.  And on the far left it says name and has a list?

13  A.  Yes.

14  Q.  Are these people who are subcontractors, what you call

15  subcontractors?

16  A.  Yes.

17  Q.  And they were all working for you?

18  A.  Everyone was working for the company that was doing that

19  general contractor's job.  So that was not for me, for

20  company.

21  Q.  Okay.  But you're the one who hired them or contracted

22  with them; is that correct?

23  A.  Yes, I am.

24  Q.  Okay.  And then are you the one -- are you the person who

25  got the jobs to work on?  In other words, you met with the

Bochenek - cross

162

1    clients and you bid the client -- the job?

2    A.  Yes.

3    Q.  And then you contracted people to do the job?

4    A.  Yes.

5    Q.  Okay.  I'm showing you what was previously marked as

6    Exhibit 1.

7    A.  Yes.

8    Q.  So you've seen this document in this litigation before?

9          MR. WILLIAMS:  Just one second.

10     (Counsel conferring.)

11   BY MR. WILLIAMS:

12   Q.  Okay.  Look at the first page of this document, 232, trial

13   document 232.  Do you see that?

14   A.  Yes.

15         MR. WILLIAMS:  I'm sorry.  Just one second.

16   BY MR. WILLIAMS:

17   Q.  And you have seen this document before --

18   A.  Yes.

19   Q.  -- correct?

20         The writing along the right-hand column, the numbers.

21   A.  Yes.

22   Q.  Furthest to the edge of the paper, do you see those

23   numbers?

24   A.  Yes.

25   Q.  For example, on Tuesday, it says 8, and then it says 1700?

Bochenek - cross

1   A.   Yes.

2   Q.   Is that your writing?

3   A.   Nope.

4   Q.   Do you see where the word "time card" appears in the

5   middle of the document?

6   A.   Yes.

7   Q.   And it shows around time, 48.45, .25.  Do you see that ?

8   A.   Yes.

9   Q.   Which is the same circle at the bottom of the page,

10   correct?

11   A.   Yes.

12   Q.   And then you see 17?

13   A.   Yes.

14   Q.   And then you see 820.25?

15   A.   Yes.

16   Q.   Okay.  Did you write that?

17   A.   Nope.

18   Q.   Do you know who did write that?

19   A.   I don't know.  Maybe someone from office, one of the girls

20   in office because they were the one collecting this paperwork.

21   Q.   Okay.  Who were the women in the office in 2006 to 2009?

22   A.   Agnes was working.  And then when we moved in 2005 she was

23   working only part-time.  And only thing she was keeping, she

24   was keeping log of payments to all subcontractors, sworn

25   statement and the waivers.  And that's what she was doing.

Bochenek - cross

1   And then in office I have two girls which were inexperienced

2   with office work, but at that time, I need just help with any

3   paperwork because at that time we really have problem to have

4   full office I used to be on Chicago Avenue.  So one was

5   Aleksandra.  I think Aleksandra Sokol, if I remember well, and

6   another Yolanda, but I don't remember the other name.

7   Q.   And they were working between 2006 and 2009?

8   A.   Yeah, about.  I think 2009 none of them were working.

9   Q.   Okay.  But you have no reason to believe that one of the

10  women who were working in your office didn't write this

11  information on this time card?

12  A.   It's possible that one of them was doing this.  This is

13  not my handwriting, and I didn't do his.

14  Q.   Do you know if Mr. Moskal was paid $820.25 this week?

15  A.   I don't know because I told you they were paid when we

16  received payments, and that's why they knew they are not

17  receiving checks like workers.  They are receiving checks like

18  subcontractors when we have payment from the job site they

19  working.

20  Q.   Okay.  I understand they didn't get paid until you got

21  paid from the -- from the customer.  But did you -- did you

22  negotiate the amount they would get paid at the beginning of

23  the job?

24  A.   Of course.  I negotiated when we have payment.  Then they

25  were coming and saying, oh, you owe us so much money, and I

1   was showing them sworn statement saying, no, we agree that you

2   going to do this for this amount.  And the same part of job

3   was done by three or four of them as a group of

4   subcontractors, and they were choosing the leading person who

5   was responsible for job.  Usually I talk to this person.  And

6   rest of guys, they have to talk to this person who was leading

7   for this group of subcontractors.

8   Q.  So for each job you had an agreement in advance of the job

9   with these people you are calling subcontractors; is that

10  correct?

11  A.  Yes.

12  Q.  Okay.  Did you provide copies of those agreements to us in

13  this litigation?

14  A.  You have sworn statements, and then every sworn statement

15  have certain line for certain portion of work.  And this is

16  where you have payment from the owner.  And portion of that

17  they are paid for making this job happen.

18  Q.  Okay.  Are these agreements, the agreements you had with

19  the people you're calling subcontractors, are they in writing?

20  A.  Oh, no.  No.  We talked about this, and they agree on

21  this, and that's why they agree on payments.  Who -- if it is

22  employee, who will work for two months or three months without

23  being paid?

24  Q.  So, Mr. Bochenek, I have a question for you here.

25  A.  Yeah.

Bochenek - cross

1    Q.   You produced these time cards to us.

2    A.   Yes, I did.

3    Q.   These time cards --

4    A.   I have this in my documents, yes.

5    Q.   Okay.  Let me ask my question.

6    A.   Yeah.

7    Q.   These time cards indicate the hours worked, and we heard

8    testimony that at least some of the hours are written by some

9    of the plaintiffs, and then there's someone else's

10   handwriting.  And then there's an accounting it seems as if a

11   number of hours times an hourly rate with a total.  You

12   produced these to us?

13   A.   Yes.

14   Q.   Okay.  Why did you keep these?

15   A.   Because this is not time cards.  I don't care about this

16   part.  What I do care is this part, what every subcontractor

17   was doing each day and how much of work was done.  And if he's

18   claiming that for this day he is to pay $300 and all of sudden

19   you're counting this and they counting together all time

20   except Bester because Bester was different.  Bester was much

21   more intellectually advanced where he was able to calculate

22   ahead of time before he start job.  Moskal was not able to

23   calculate what the job will be, and he was working with crew

24   of people.  And all of them knew how much money it is.  So

25   that was -- for him was guideline how much he should make.

Bochenek - cross

1   That was in his head how much he should make when job is

2   finished.  And when job was finished below this amount, they

3   accept lower because I was showing them what we receiving.

4   And this is subcontractor's agreement.  And they agree on

5   these payments.

6   Q.  They agree on what payment?

7   A.  On subcontractor's payments which was very often below

8   what they were dreaming about.  And as Bester says, some of

9   these payments were higher if they -- they perform properly

10  and they could make more money.

11  Q.  I'm showing you what was previously introduced as

12  Exhibit 5.

13  A.  Yes.

14  Q.  These are time cards for Mr. Jaworski.

15  A.  Yes.

16  Q.  Is your response to this exhibit the same as it was to

17  Exhibit 1?

18  A.  Mr. Jaworski was a little different.  He came to this

19  country with green card without knowledge of English and no

20  job.  And he was referred to me as a great mechanic and

21  electronic.  So he can work independently on my equipment and

22  fix my equipment because lots of my equipment needs attention,

23  and I have to send to shop.  He was on a majority of this --

24  this is not time cards, No. 1.  This is report cards for me.

25  They use form of time cards because time cards were used that

Bochenek - cross

1    every portion of this was punch in, punch out.  That's why you

2    have this portion of this time cards when it was used by time

3    cards.  But they were copying this and using because it was

4    very handy.

5             So Mr. Jaworski was opening himself the building in

6    Elgin, working as long he wants, closing, and he was telling

7    me, this will cost you that much piece of equipment.  Happened

8    to be that the pieces of equipment he worked, only few of them

9    was repaired right.  And, for example, dump truck, when I have

10   auction two years ago which I bought for $48,000 was sold for

11   11 because he repaired engine without my supervision where

12   engine was not working.  One bobcat where he got in this

13   reports cards that he work on bobcat is still sitting there

14   and not working.  And he still receive some portion of payment

15   for that because he was requesting as a prepayment.

16            So that was no phone calls, and that was no questions

17   when he is coming, when he is leaving because he got keys.  He

18   was coming and leaving at his time.

19   Q.  Well, you testified earlier that it's possible some of the

20   women in the office altered the time cards before making the

21   calculation on the time card.  If these -- if the hours didn't

22   matter, why would they be altered?

23   A.  I don't know why they alter, but some of that is obvious

24   if he was not showing, for example, to the building, 10:00 and

25   he was putting 7:00, and the girl was in the office saying you

Bochenek - cross

1    came 10:00, why you have something like this?  Of course she

2    was changing this.  And that was base for them.  That was base

3    for them to understand that this is how much money they can

4    receive when they have payment.  They have to keep some record

5    for the job they doing, and it is job for 15 or 20,000, you

6    cannot wait to the end, especially if you are smaller and you

7    have to have prepayment.

8    Q.  Okay.  Earlier I showed you an exhibit which was the -- I

9    think you called it the AIA forms, the American Institute of

10   Architecture forms, the project forms.  Do you want to see

11   that again?  It's Exhibit 10.

12   A.  No, I didn't see that.  Oh, this is AIA?  I didn't even

13   know.

14   Q.  This is a document you produced you testified

15   Mr. Karpinski kept on your behalf?

16   A.  Yeah, I didn't know it was AIA.  I saw it.

17   Q.  Do you dispute the accuracy of that document, the records

18   in that document?

19   A.  Some of this record -- when I talked to Joe, some of this

20   record was corrected because even what he was putting was

21   sometimes wrong because he was not on job site, and he was

22   talking to subcontractors asking them, so what you time you

23   come?  I cannot force him to come on time.  I cannot force him

24   to leave on time because I was not paying for his job.  So...

25              THE COURT:  All right.  Mr. Williams, we're going to

Bochenek - cross

1   stop for today.  We'll pick up the cross-examination tomorrow

2   morning.

3          Counsel should be here ready to go at 9:30.  I have a

4   regular call on Tuesday, but we should be able to go, get

5   started right after that, which should be approximately 9:30.

6          Mr. Bochenek, you are under oath.  You are on

7   cross-examination.  So you may not testify -- you may not

8   discuss your testimony with your counsel; all right?

9          THE WITNESS:  Okay.

10          THE COURT:  Beyond the testimony of the defendant, do

11   you anticipate calling any additional witnesses, Mr. McNeil?

12          MR. McNEIL:  I'm sorry.  I didn't hear you.

13          THE COURT:  Do you anticipate calling any other

14   witnesses?

15          MR. McNEIL:  No.

16          THE COURT:  All right.  So we'll finish up with this

17   testimony in the morning and then we will discuss the

18   posttrial process.

19          MR. WILLIAMS:  Okay.

20          THE COURT:  All right.  9:30 tomorrow morning,

21   please.

22          MR. WILLIAMS:  Thank you, Your Honor.

23          THE WITNESS:  Thank you.

24          THE COURT:  Thank you.

25     (Which were all the proceedings heard.)

CERTIFICATE

  I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kelly M. Fitzgerald*              *April 1, 2016*

_____        _____

Kelly M. Fitzgerald              Date
Official Court Reporter